John Darwin **AHRENS, Jr.,** Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 17419.

United States Court of Appeals
Fifth Circuit.

April 16, 1959.

Hilary J. Gaudin, New Orleans, La., for appellant.

Norman Prendergast, Asst. U. S. Atty., New Orleans, La., M. Hepburn Many, U. S. Atty., New Orleans, La., for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

Appellant was convicted of sending in interstate commerce four telegrams in connection with a scheme he was charged with having devised for obtaining money from Emory Lee Graves of Slidell, Louisiana, in violation of § 1343 of 18 U.S. C.A.[1] He was sentenced to imprisonment for five years under each of said counts, the sentences to run concurrently. He appeals, assigning as error that the trial court erred in denying his motion for judgment of acquittal and in admitting the evidence of a witness, King, that appellant had practiced a like scheme upon him, said evidence being offered to prove intent.

---

1. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire * * * communication in interstate or foreign commerce, any writings, * * * for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

Graves testified that appellant called him over long distance telephone August 4, 1956 from Arkansas, asking that Graves meet him at a hotel in Baton Rouge, Louisiana on August 6th, appellant stating that he was investigating to determine if he could procure a loan of $150,000 for Graves' company to build about twenty houses at Slidell. The parties met and executed a contract prepared by appellant under which appellant was to endeavor to obtain a loan at a low rate of interest from a wealthy principal on the East Coast he represented he was in touch with. Appellant was to be paid a five percent finder's fee upon the making of the loan and was to receive advances for expenses in the sum of $1,000.

The contract provided also for Graves to furnish an endowment insurance policy with provisions for waiver of premiums and double indemnity under stipulated contingencies. Graves had brought with him insurance agents to write the insurance, but appellant insisted on an agent of his own selection. The policy was applied for and physical examination made the same day, and Graves testified that the policy was issued with all of the required provisions. He paid an initial premium of $548, and also gave appellant his check for $500. Appellant called by telephone from Phoenix, Arizona August 8th requesting Graves to wire him $500 because of his inability to cash the check there, and Graves complied by transmitting said amount by telegraph on the same date. Appellant replied with a telegram stating: "Thanks. Money Okeh. Leave for East today. Phone you Saturday."

August 18th, appellant telephoned from Memphis stating there had been a delay in the loan due to serious illness of the principal and asking that Graves send him $500 whereupon he would return to the East "and discuss it with his principal immediately, and forward me [Graves] by return wire $5,000 to assist us in our building program that was already commenced." Graves immediately wired appellant $350 and appellant replied: "$350 loan received. Will repay ten days. Leaving for Boston tonight. Regards." Graves, hearing nothing from appellant, tried several times to reach him at the address he had given. Finally, Graves contacted him by telegram dated October 8th which advised appellant that he must have immediate information regarding loan because of pressing monthly insurance premium.

Appellant replied by telegram reading in part: " * * * wasn't able to reach you by phone tonight because of serious illness of chief principal. Deal necessarily has been delayed but expect to complete very shortly. Please advise by Western Union if Parker policy was issued at standard rate and had premium waiver and double indemnity clause included in policy. Expect wire immediately." Graves wired October 9th: "Have been home constantly awaiting your call. Deal must be completed by the 12th. Parker policy rated has premium waiver and double indemnity clauses. Suggest act now or forget friendship."

Appellant answered from Little Rock, Arkansas October 10th: "Wire received. Regret delay. Will expedite as much as possible. Hope to have good news by tomorrow. If so, will phone." Graves tried a number of times to contact appellant after that, but was never able to reach him and nothing further was heard with respect to the proposed loan.

The Government also placed on the stand Thomas Michael King, who was permitted to testify over appellant's objection to a similar transaction he had with appellant originating around the middle of July, 1956, and relating to a loan appellant was to attempt to obtain in the sum of $100,000 at a low rate of interest on King's ranch near Hot Springs, Arkansas. The contract was similar to that with Graves and provided for insurance policy in the same terms and for advancement of $1,000 expense money.

About August 4th, appellant stated over long distance telephone that he had contacted his principal at Phoenix, Arizona and ascertained that he would lend the desired amount on the ranch, upon

which assurance King wired appellant $250, which appellant acknowledged by wire. Several communications by wire and long distance telephone passed between them, and appellant stated that the making of the loan was delayed, first by the absence of the principal's lawyer and, second, by the sudden serious illness of the principal who was required to undergo a serious operation at Mayo Brothers Hospital in Rochester, Minnesota.

Finally, appellant called from Memphis stating that he needed $300 to fly to Phoenix where he would obtain the $100,000 and come immediately and deliver it to King. In response to this request King wired appellant $100 and appellant replied by telegraph: "Thanks for loan. Leaving for coast tonight. Will repay in five days." King, too, made many attempts to get in touch with appellant, but was never able to do so. King had finally procured an insurance policy to be issued, but it was never delivered because King had become convinced that appellant would not perform the contract between them.

■■ We think that the testimony of King was admissible under the circumstances. The actual happenings between appellant and Graves were not in dispute. The question the jury had to determine was appellant's intent.[2] This whole question was explored at length by this Court in Weiss v. United States, 5 Cir., 1941, 120 F.2d 472, rehearing denied 122 F.2d 675, 682, et seq., certiorari denied 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550. The rule is there epitomized:

"* * * The general rule is that evidence of another crime unconnected with the one on trial is inadmissible, but this rule is subject

to a number of exceptions, the first of which is that evidence of other offenses by the accused is admissible to show his criminal intent as to the offense charged, where the other offenses are similar to and not too remote from that charged, and where intent is in issue as an element of the offense charged. * * *"

And we quoted the general rule, stated in like words, from § 310, 20 American Jurisprudence, Evidence, in our decision in Jencks v. United States, 5 Cir., 1955, 226 F.2d 540, 550, reversed on other grounds 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103.

A cautious use of such testimony as to other crimes has been made quite generally over the years. The court below observed the requisite caution when it charged the jury specifically that the King testimony was not admitted as proof of the substantive crime charged against appellant, but only to assist the jury in arriving at his motive and intent in doing the things he did.

■ And we think that appellant is on no sounder ground in his contention that there was not enough evidence to warrant the jury in convicting him of the crime charged. There is no dispute that the telegrams were all sent, and that the dealings outlined above were had between appellant on the one side and Graves and King on the other in the two separate transactions being conducted about the same time. The circumstances which were sufficient to sustain the jury's verdict include the fact that there were long delays assertedly because two different undisclosed principals in widely separated portions of the country became suddenly ill; the emphasis, somewhat belated in each instance, on the pe-

---

2. Here is the way the court below defined the issue in its charge:

"This case revolves around the question, Was there a scheme to defraud? Was the Defendant Ahrens actually offering a loan or the possibility of a loan to Mr. Emory Graves, or was this whole thing a figment of the Defendant's imagination, conceived for the purpose of obtaining small amounts, relatively small

amounts of money, from the victims.

* * *

"A scheme to defraud is a dishonest means to obtain money or property from another by means of false pretenses or representations. The hallmark of a scheme to defraud is dishonesty. It involves fraudulent intent. It involves intent to deceive. * * *"

culiar and apparently unimportant terms of the insurance contracts; the reference by appellant to the advancements made to him as loans rather than as payments on account of his expenses; and the long lapse of time with no performance of the contracts in which time was an important element.

■ It is not our province to make our examination of the record a quest for error. It is our duty only to ascertain whether reasonable minds could have reached the conclusion that the facts in evidence were sufficient to establish the guilt of appellant beyond reasonable doubt.[3]

In Jencks, supra, (226 F.2d 549) we quoted from Bradford v. United States, 5 Cir., 1942, 129 F.2d 274, 277, this language concerning unexplained circumstances pointing to accused's guilt: "These salient facts, standing out in the midst of many minor circumstances in evidence were sufficient to require some contradictory or explanatory testimony (not necessarily by, but) in behalf of Will Bradford, or an inference of guilty knowledge reasonably could be drawn against him by the jury. The presumption of innocence is one of the strongest rebuttable presumptions known to the law, but it disappears when a verdict of guilty, supported by substantial evidence, is returned against the defendant."

The Government attorneys argued in presenting the case to the jury that appellant was not in touch with any moneylenders, that the story about the illness of the principal was entirely fictitious, and that the entire scheme was a device to extract money from Graves. These legitimate inferences were not refuted in any way by appellant. There were plainly other means by which some explanatory proof could have been offered by appellant without his taking the stand. In the absence of such explanation we hold that the verdict of the jury was justified.

No error appearing in the record, the judgment of the lower court is affirmed.

Affirmed.

---

3. We do not find Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88, a mail fraud case, or United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359, a case involving interstate transportation of fraudulent checks, at variance with the principles here announced.