PARR ET AL. *v.* UNITED STATES.

No. 391. Argued April 28, 1960.—Decided June 13, 1960.

*Abe Fortas* and *T. Gilbert Sharpe* argued the cause for petitioners. With them on the brief were *Paul A. Porter, Charles A. Reich* and *Luther E. Jones, Jr.*

*Assistant Attorney General Wilkey* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Edgar O. Bottler, Beatrice Rosenberg* and *Eugene L. Grimm.*

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

Petitioners, nine individuals and two state banking corporations,[1] were indicted in 20 counts in the United

---

[1] The petitioners are George B. Parr, D. C. Chapa, B. F. Donald, Octavio Saenz, Jesus G. Garza, Santiago Garcia, Oscar Carrillo, Sr.,

States District Court for the Southern District of Texas, *Houston Division,* for mail fraud and conspiracy to commit mail fraud. The first 19 counts charged that petitioners devised, prior to September 1, 1949, and continued to February 20, 1954, a scheme to defraud the Benavides Independent School District ("District") of Duval County, Texas, the State of Texas, and the taxpayers of each, and that they used the mails for the purpose of executing the scheme, in violation of 18 U. S. C. § 1341.[2] The twentieth count charged that petitioners conspired to commit the substantive offense charged in the first count, in violation of 18 U. S. C. § 371.[3]

After their various motions, including one challenging venue and asking transfer of the action to the Corpus Christi Division of the court, and one for a bill of particulars, were denied, petitioners entered pleas of "not guilty" and in due course the case was put to trial before a jury. The jury returned verdicts finding petitioners

O. P. Carrillo, Jesus Oliveira, Texas State Bank of Alice and San Diego State Bank, all of Duval County, Texas, in the *Corpus Christi Division* of the United States District Court for the Southern Division of Texas.

[2] Section 1341 provides, in pertinent part, as follows:

"Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . for the purpose of executing such scheme . . . places in any post office or authorized depository for mail matter, any matter . . . to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon . . . any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U. S. C. § 1341.

[3] Section 371 provides, in pertinent part, as follows:

"If two or more persons conspire . . . to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. . . ." 18 U. S. C. § 371.

guilty as charged—some of them on all counts and others on only some of the counts. After denying timely motions in arrest of judgment and for a new trial, the court entered judgments upon the verdicts, convicting petitioners and sentencing them to imprisonment.[4]   On appeal, the judgments were affirmed, 265 F. 2d 894, and, to determine questions of importance relative to the scope and proper application of § 1341, we granted certiorari. 361 U. S. 912.

Petitioners' principal contentions here are: (1) that, although the indictment charged and the evidence tended to show that petitioners devised and practiced a scheme to defraud the District by the local or state crimes of misappropriating and embezzling its money and property, neither the indictment nor the proofs support the judgments, because the indictment did not charge, and the proofs did not show, any use of the mails "for the purpose

---

[4]

| Names | Counts on which convicted | Sentences |
|---|---|---|
| George B. Parr | All | Aggregate of 10 years and $20,000 fine. |
| D. C. Chapa | All | Aggregate of 5 years. |
| B. F. Donald | 1–14, 17–20 | Aggregate of 4 years. |
| Jesus G. Garza | All but 7 | 3 years, but suspended on probation. |
| Santiago Garcia | 4, 5, 8, 13, 14, 15, 17–19 | 3 years, but suspended on probation. |
| Octavio Saenz | All but 7 | Aggregate of 3 years. |
| Oscar Carrillo, Sr. | All | Aggregate of 4 years. |
| O. P. Carrillo | 20 | 2 years, but suspended on probation. |
| Jesus Oliveira | 20 | 2 years, but suspended on probation, and fine of $7,000. |
| Texas State Bank of Alice | All | Fine of $2,000. |
| San Diego State Bank | 1–3, 7, 10–12, 16, 20 | Fine of $900. |

374

of executing such scheme" within the meaning of that phrase as used in § 1341, and (2) that the court's charge did not submit to the jury any theory or issue of fact that could constitute use of the mails "for the purpose of executing such scheme." The nature of these contentions requires a detailed examination of the indictment, the evidence adduced, and of the issues of fact actually tried and submitted to the jury, for its resolution, by the court in its charge.

We turn first to the indictment. Summarized as briefly as fair statement permits, the first count alleged that the District is a public corporation organized under the laws of Texas to acquire and hold the facilities necessary for, and to operate, the public schools within the District,[5] and, for those purposes, to assess and collect taxes; that the laws of Texas vest exclusive control of the property and management of the affairs of the District in its Board of Trustees, consisting of seven members; that prior to September 1, 1949, petitioners devised, and continued to February 20, 1954, a scheme to defraud the District, the State of Texas, and the taxpayers of each, and to obtain their money and property for themselves and their relatives.

It then alleged that, as part of the scheme, petitioners would falsely represent that district checks were issued, and its funds disbursed, only to persons and concerns for services rendered and materials furnished to the District, and that its Annual Reports to the State Commissioner of Education were correct.

It next alleged that, as a further part of the scheme, seven of the petitioners would establish and maintain

---

[5] The District operates the public schools in the towns of Benavides and Freer in Duval County, Texas. The schools in each town have slightly more than 1,000 pupils.

domination and control of the District; [6] that three of them would acquire and maintain control of petitioner, the Texas State Bank of Alice, which was the authorized depository of the District's funds,[7] and that one of them would acquire and maintain control of petitioner, the San Diego State Bank.[8]

It then alleged that it was a further part of the scheme that petitioners would send or cause to be sent letters, tax statements, checks in payment of taxes, and receipted tax statements, through the United States mails; that the checks and moneys received by the District from taxpayers and others would be deposited to the credit of the District in the authorized depository bank, against which petitioners would issue district checks payable to fictitious persons, and to existing persons, without consideration (falsifying the District's records to show that such checks were issued in payment for services or materials), and would cash such checks, upon forged endorsements or without endorsements of the payees, at the depository bank and convert the proceeds; that they would open accounts and deposit checks received in payment of taxes in unauthorized banks, and that petitioner Chapa would withdraw and convert the funds; that they would convert and cash checks received by the District in payment of taxes and keep the proceeds; that they would obtain merchandise for themselves on the credit and at the expense of the District; that they would prepare, and the Board of Trustees would approve, false Annual Reports of the District and mail them to the State Commissioner of

---

[6] The persons named in the allegation were petitioners Parr, Chapa, Oscar Carrillo, Sr., O. P. Carrillo, Saenz, Garza and Garcia.

[7] The persons named in the allegation were petitioners Parr, Donald and Oliveira.

[8] The allegation was that control of the San Diego State Bank would be maintained by petitioner Parr.

Education at Austin, Texas; that they would conceal their fraudulent misuse of district funds by destroying canceled checks, bank statements and other records of the District and the microfilmed records of the petitioner banks showing the fraudulent checks drawn against and paid out of the District's accounts.

The last paragraph of the count—the only paragraph purporting to charge an offense—charged that petitioners on September 29, 1952, for the purpose of executing the scheme, caused to be taken from the post office, in the Houston Division of the court, a letter addressed to Humble Oil & Refining Company, Houston, Texas.[9]

Each of Counts 2 through 19 adopted by reference all allegations of the first count, except those contained in the last paragraph of that count which charged a specific offense against petitioners, and then proceeded to allege that on a stated date the petitioners, for the purpose of executing the scheme, "caused" a particular letter, tax statement, check, tax receipt or invoice to be placed in or taken from an authorized depository for United States mail in the Houston Division of the court.[10] Doubtless

[9] The letter referred to was one by the District of Sept. 26, 1952, to Humble Oil & Refining Co., Houston, Texas, giving notice of a modification in the assessed value of the latter's property in the District to $2,542,920 for the year 1952, and advising that the amount of tax, at the rate of $1.75 per $100, was $44,501.10.

[10] The second count described a letter by the Secretary of the Board of Equalization of the District, dated July 18, 1952, to Humble Oil & Refining Co., Houston, Texas, giving notice of a hearing to be held by that Board at Benavides on Aug. 1, 1952, to determine the taxable value of the latter's lands in the District for the year 1952.

The third count described a check of Humble Oil & Refining Co., Houston, Texas, dated Sept. 26, 1952, payable to the Tax Collector in the amount of $43,166.07, and the accompanying letter of the taxpayer, dated Sept. 29, 1952, advising that the attached check was in payment of "the correct taxes [of] $44,501.10" on the taxpayer's property in the District for 1952, less "the 3 per cent discount for

the charge in each of these counts was so limited, in the light of Rule 18 of Federal Rules of Criminal Procedure fixing venue over crimes in the District and *division* where

---

September payment of $1,335.03 leaving a net of $43,166.07 as evidenced by our check."

The fourth count described a check of Humble Oil & Refining Co., Houston, Texas, dated Sept. 24, 1953, payable to the Tax Collector in the amount of $53,807.35, and the accompanying letter of the taxpayer, dated Sept. 24, 1953, advising that the attached check was in payment of taxes for the year 1953.

The fifth count described a letter by the Secretary of the Board of Equalization, dated May 20, 1953, to Humble Oil & Refining Co., Houston, Texas, giving notice of a hearing to be held by that Board at Benavides on June 2, 1953, to determine the taxable value of the latter's property in the District for the year 1953.

The sixth count described a check of Humble Oil & Refining Co., dated Sept. 25, 1951, payable to the Tax Collector in the amount of $34,285.09, and the accompanying letter of the taxpayer, dated Sept. 26, 1951, advising that the attached check was in payment of taxes for the year 1951.

The seventh count described a letter of Dec. 3, 1952, by the District to C. W. Hahl Co., Houston, Texas, complying with a request for an "auxiliary tax notice covering Surface Fee in the Rosita Townsite."

The eighth, ninth and tenth counts described checks of C. W. Hahl Co., Houston, Texas, dated Sept. 25, 1953, Sept. 21, 1951 and Sept. 26, 1952, respectively, payable to the Tax Collector in the amounts of $544.21, $555.25 and $451.70, respectively, and accompanying letters of the taxpayer advising that the attached checks were in payment of taxes on certain property in the District for the years 1953, 1951 and 1952, respectively.

The eleventh, twelfth and thirteenth counts described voucher checks of the Texas Company, Houston, Texas, dated Sept. 27, 1951, Sept. 26, 1952, and Sept. 30, 1953, respectively, payable to the Tax Assessor in the amounts of $13,532.64, $13,078.72 and $14,665.04, respectively, in payment of taxes on certain property in the District for the years 1951, 1952 and 1953, respectively.

The fourteenth count described a check of the Texas Pipe Line Co., Houston, Texas, dated Sept. 30, 1953, payable to the Tax Collector in the amount of $330.84, and the taxpayer's accompanying

committed,[11] in order to give the Houston Division venue over this action, and consequently the indictment does not count upon petitioners' full uses of the mails, for they were principally made in Duval County in the Corpus Christi Division of the court.

The twentieth count charged that throughout the relevant period petitioners feloniously conspired and agreed among themselves and with others to commit "the offenses . . . which are fully described and set out in the first count of this indictment," and that, to effect the object of the conspiracy, petitioners committed specified overt acts.[12]

---

letter advising that the attached check was in payment of taxes for the year 1953.

The fifteenth and sixteenth counts described checks of J. E. Beall, Houston, Texas, dated Sept. 30, 1953 and Oct. 24, 1952, respectively, payable to "Benavides Indep. School Dist." in the amounts of $415.72 and $355.55, respectively, in payment of taxes for the years 1953 and 1952, respectively.

Count 17 described an invoice or statement of Continental Oil Co., Houston, Texas, dated May 25, 1953, to the District for merchandise in the amount of $273.85; Count 18 described a check of the District dated Mar. 31, 1953, payable to Continental Oil Co. in the amount of $353.02, and Count 19 described a statement of Continental Oil Co., dated Mar. 20, 1953, to the District for merchandise in the amount of $353.02, which was paid by the District's check described in Count 18.

[11] Rule 18 of Fed. Rules Crim. Proc. provides:

"Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed, but if the district consists of two or more divisions the trial shall be had in a division in which the offense was committed."

[12] The overt acts alleged were the sending by mail of tax receipts to Humble Oil & Refining Co. at Houston, Texas, on Oct. 4, 1951, to the Texas Co. at Houston, Texas, on Oct. 11, 1951, and Oct. 15, 1953, and to the Texas Pipe Line Co. at Houston, Texas, on Oct. 7, 1952; the deposit by the Texas Pipe Line Co. in the mails at Houston, Texas, on Sept. 30, 1952, of a letter and attached check for $325.07 addressed to the assessor-collector at Benavides, Texas; that D. C. Chapa converted and cashed at the Merchants Exchange Bank,

We now look to the evidence. Condensed to pith, the 6,000 pages of evidence disclose that the District, acting through its Board of Trustees of seven members, operated the public schools in the towns of Benavides and Freer, each having slightly more than 1,000 pupils. From time to time the Board met to appoint (a) an assessor-collector, (b) an independent firm of engineers and accountants to assist the assessor-collector in determining the ownership and valuation of property—particularly mineral lands and complex fractional interests therein—in the District, (c) a Board of Equalization, and (d) a depository of the District's funds, and also met (e) to consider and propose to the electorate the authorization and sale of bonds in 1949 ($265,000) and in 1950 ($362,500) to finance the construction of new school facilities.

In actual operations the engineering-accounting firm would annually prepare and submit to the assessor-collector a list showing the ownership and its appraisal of the value of the various properties and mineral interests in the District, from which, after the Board of Equalization had completed its work thereon (in June and July), the assessor-collector would prepare the tax rolls for the current year and therefrom prepare and send out the tax statements by mail, and on receipt of checks in payment of taxes (the great majority of which were received in the mails) would—with exceptions later noted—deposit them to the credit of the District in the depository bank, and then mail receipts to the taxpayers.

Three members of the Board resided in Freer, and the other four resided in Benavides. Aside from the meet-

Benavides, Texas, checks payable to the District assessor-collector, (1) of J. E. Beall for $355.55 on Nov. 8, 1952, (2) of Barbara Oil Co. for $361 on Nov. 15, 1952, (3) of O. W. Greene for $298.43, (4) of Peal Properties for $230.92, (5) of Allen Martin for $300.82 on Nov. 22, 1952, and (6) of Jones-Laughlin Supply for $320.15 on Oct. 17, 1952.

380

ings for the purposes above stated, the Trustees rarely met as a board. Each group, rather independently, operated the schools in its town, and the actual costs of operation were about the same in each town.[13] But the Benavides members handled generally the day-to-day business of the District, including the staffing and operation of its office, the keeping of its books and records, the making of its contracts, its relations with the assessor-collector, the Annual Report to the State Commissioner of Education (to obtain from the State the amount per pupil prescribed to be paid to such school districts by the Texas law) and the routine disbursement of its funds.

Petitioners Saenz, Garza and Garcia were three of the four Benavides members of the Board. Petitioners Oscar Carrillo, Sr., and O. P. Carrillo were, respectively, the secretary of and the attorney for the Board. Petitioner Chapa was the assessor-collector. Petitioner Parr was the president and principal stockholder of petitioner Texas State Bank—the authorized depository of the District's funds—and of petitioner San Diego State Bank, and there was evidence that, although having no official connection with the District, he practically dominated and controlled its affairs, kept its books and records in his office, outside the District, until July 1951, and counter-signed all its checks after June 1950. Petitioner Donald was the cashier and administrative manager of the Texas

---

[13] The actual costs of operating the schools at Freer were about $200,000 per year. They were estimated to be approximately the same amount at Benavides. Although there was evidence estimating the District's total tax assessments, not collections, at about $400,000 for 1949, at about $650,000 for 1952, and the tax rolls show a total tax assessment of $519,613.51 for 1953, the Board's records show tax collections of $310,840.59 for 1949, $295,161.25 for 1950, $370,852.42 for 1951 and $385,084.96 for 1952. The Board had other income, including payments from Duval County and the pupil per capita amount paid by the State, of about $140,000 per year.

State Bank, and petitioner Oliveira was a director of that bank.

There was evidence that throughout the relevant period the District's funds, in large amounts, were misappropriated, converted, embezzled and stolen by petitioners. It tended to show that four devices were used for such purposes:

(1) At least once each month numerous district checks were issued against both its building and maintenance accounts in the depository bank payable to fictitious persons and were presented in bundles, totaling from $3,000 to $12,000, to the depository bank and, under the supervision of petitioner Donald, were cashed by it, without endorsements, and the currency was placed and sealed in an envelope and handed to the presenting person for delivery to petitioner Parr. The evidence tended to show that no less than $120,000 of the District's funds were misappropriated in this way. However, no one of these acts is charged as an offense by the indictment.

(2) At least once each month large numbers of district checks were issued to petitioners, other than Donald and the two banks, often in assumed names or in the names of members of their families, purporting to be in payment for services rendered or materials furnished to the District but which were not rendered or furnished, which checks were presented to the depository bank and, under the supervision of petitioner Donald, were cashed by it, often without or upon forged endorsements.[14] The

---

[14] Petitioners Saenz, Garcia, Garza, Oliveira and Chapa regularly received district payroll checks, sometimes in their own names but usually under one or more fictitious names, for services not rendered. Saenz regularly received eight payroll checks in various names; Garcia regularly received payroll checks in the name of his daughter, so did Garza; Oliveira regularly received such checks, sometimes payable to him and at other times to his implement company. Chapa regularly received three such checks each month in various names. All

evidence tended to show that no less than $65,000 of the District's funds were misappropriated in this way. But again no one of these acts is charged as an offense by the indictment.

(3) Petitioner Chapa converted district checks received by mail in payment of taxes, cashed the same—some at a local bank and some at the depository bank—upon unauthorized endorsements, and misappropriated the proceeds.[15]

(4) Petitioners Oscar Carrillo, Sr., and Garza obtained gasoline and oil for themselves upon the credit card and at the expense of the District.[16] Use of the mails by "causing" the oil company to place its invoices for these goods in the mails and to take the District's check in payment from the mails in Houston, constitutes the basis of Counts 17, 18 and 19 of the indictment.[17]

The letters, checks and invoices which Counts 1 through 19 of the indictment charge were "caused" by petitioners to be placed in or taken from the mails in Houston, were all offered and received in evidence. Having fully stated the substance of them in notes 9 and 10, we do not repeat it here. The evidence also tended to prove the overt acts alleged in the twentieth count of the indictment.[18]

_____

of the checks mentioned were for from $100 to $125. A payroll check for $500 was issued monthly in the name of Parr's brother-in-law, who rendered no services for the District.

[15] Included in the checks so converted and cashed by Chapa were the checks of J. E. Beall for $415.72 and for $355.55, described in the fifteenth and sixteenth counts, but there was evidence that he similarly converted and cashed other district checks totaling about $25,000.

[16] There was evidence, too, that petitioner O. P. Carrillo procured the remodeling of his law office and new office furniture and equipment on the credit and at the expense of the District to the extent of about $2,500.

[17] See note 10 re Counts 17, 18 and 19.

[18] See note 12.

We now proceed to examine the court's charge to determine what theories and issues of fact were predicated by the court and submitted for resolution by the jury. Relative to Counts 1 through 19 of the indictment, the court, after reminding the jury that the indictment had been read to them at the beginning of the trial and that they would have it with them for study during their deliberations in the jury room, read aloud § 1341, defined numerous words and phrases, cautioned on many scores, including the weight to be given to the testimony of "accomplices," stressed the Government's burden of proof, and then proceeded to give the one verdict-directing charge covering those counts which, in pertinent part, was as follows:

> "Applying the law to the first 19 counts of the indictment, if you believe beyond a reasonable doubt that the defendant George B. Parr and the other defendants charged and triable in Count One of the indictment considering each separately, did the things that it is alleged that he did do in the first count of the indictment, and at the time that it occurred there existed a scheme to defraud, and that, as a result of such scheme, the mails were used necessarily or incidentally to the carrying out of that scheme, and, as a result thereof, . . . he did cause the defrauding or obtaining of property by false pretenses and representations in any of the particulars set forth therein . . . and that he used the United States Mails as set forth in Count One, . . . then it becomes your duty . . . to find such defendant or defendants guilty as charged in the first count of the indictment and so find by your verdict. . . . The same reasoning and instructions apply to each of the first nineteen counts of the indictment and as to each of the defendants charged and triable in each of the first nineteen counts of the indictment."

Relative to the twentieth count, the court, after reading to the jury § 371, telling them that the essence of the charge "is an agreement to use the mails to defraud," defining "conspiracy," commenting on "circumstantial evidence," and stressing the Government's burden of proof, proceeded to give the one verdict-directing charge covering that count which, in pertinent part, was as follows:

"Therefore, with reference to the 20th count, if you believe as to any of the alleged conspirators that that person, together with at least one other, did the things charged against him in such count . . . to effect the objects of the alleged conspiracy, and thereafter there was done one or more of the overt acts set forth in such count . . . then it becomes your duty under the law as to such defendant or defendants that you so believe as to such 20th count were guilty, to so say by your verdict . . . ." [19]

---

[19] Before the giving of the charge, petitioners' counsel, among numerous requests for charge, had requested the court to charge the jury as follows:

"You are further instructed that if the use of the mails involved in each of the first 19 counts of the indictment was solely for the purpose of collection of taxes by the Benavides Independent School District, or for the purpose of payment of same by taxpayers, or if you have a reasonable doubt in regard thereto, you will find the Defendants and each of them, 'Not Guilty,' as to each of the first 19 counts of the indictment."

A similar charge was requested with respect to the twentieth count. Both requests were denied.

After the court's charge, counsel for petitioners excepted to the charge on the grounds, among others, that it did "not apply the law given to the facts in any way," was "an abstract instruction which nowhere applies the complete law . . . to the facts in this case," and, with particular reference to the twentieth count, did not instruct the jury "as to the exact essential elements of the offense involved in the first count of the indictment."

In the light of this review of the indictment, the evidence adduced and the court's charge to the jury, we return to the questions presented by petitioners.   There can be no doubt that the indictment charged and the evidence tended strongly to show that petitioners devised and practiced a brazen scheme to defraud by misappropriating, converting and embezzling the District's moneys and property.   Counsel for petitioners concede that this is so.   But, as they correctly say, these were essentially state crimes and could become federal ones, under the mail fraud statute, only if the mails were used "for the purpose of executing such scheme." [20]   Hence, the question is whether the uses of the mails that were charged in the indictment and shown by the evidence properly may be said to have been "for the purpose of executing such scheme," in violation of § 1341.   Petitioners say "no." The Government says "yes."

Specifically, petitioners' position is that the School Board was required by law to assess and collect taxes for the acquisition of facilities for, and to maintain and operate, the District's schools; that the taxes, assessed in obedience to that duty and for those purposes, were not charged in the indictment or shown by the evidence to have been in any way illegal, and must therefore be assumed to have been entirely lawful; that to perform its duty to assess and collect such taxes, the Board was both legally authorized and compelled to cause the mailing of the letters and their enclosures (tax statements, checks and receipts) complained of in the indictment, and hence those mailings may not be said to have been "for the purpose of executing such scheme," in violation of § 1341.

The Government, on the other hand, contends, first, that it was not necessary to charge or prove that the taxes were unlawful, for it is its view that once the scheme to

---

[20] 18 U. S. C. § 1341, quoted in note 2.

defraud was shown to exist, the subsequent mailings of the letters and their enclosures, even though legally compelled to be made, constituted essential steps in the scheme and, in contemplation of § 1341, were made "for the purpose of executing such scheme"; but it asserts that, in fact, it was *impliedly* charged in the indictment and shown by the evidence that the taxes were illegal in that they were assessed, collected and accumulated in excess of the District's needs in order to provide a fund for misappropriation, and, second, that the indictment charged and the evidence showed that the mailings *impliedly* pretended and falsely represented that the tax moneys would be used only for lawful purposes, and, hence, those mailings were caused for the purpose of obtaining money by false pretenses and misrepresentations, in violation of § 1341.

After asserting complete novelty of the Government's position and that no reported case supports it, counsel for petitioners point to what they think would be the "explosively expanded" and incongruous results from adoption of the Government's theory, *e. g.,* making federal mail fraud cases out of the conduct of a doctor's secretary or a business concern's billing clerk or cashier in mailing out, in the course of duty, the employer's lawful statements with the design, eventually executed, of misappropriating part of the receipts—the aptness of which supposed analogies, happily, we are not called on to determine. But petitioners' counsel concede that if such secretary, clerk or cashier—and similarly a member of a School Board—improperly "pads" or increases the amounts of the statements and causes them to be mailed to bring in a fund to be looted, such mailings, not being those of the employer (or School Board), would not be duty bound or legally compelled and would constitute an essential step "for the purpose of executing [a] scheme" to defraud, in violation of § 1341. They then repeat and stress their

claim that here the indictment did not allege, and there was no evidence tending to show, that the taxes assessed and collected were excessive, "padded" or in any way illegal, that the court did not submit any such issue to the jury and that such was not the Government's theory.

It is clear and undisputed that the School Board was under an express constitutional mandate to levy and collect taxes for the acquisition of facilities for, and to maintain and operate, the schools of the District, Constitution of Texas, Art. 7, § 3,[21] and was required by statute to issue statements for such taxes and to deliver receipts upon payment.[22]

The Texas laws leave to the discretion of such school boards the valuation of properties and the fixing of the tax rate, within a prescribed limit, in the making of their assessments,[23] and their determinations, made within the prescribed limit as here, are not judicially reviewable, *Madeley v. Trustees of Conroe Ind. School Dist.*, 130 S. W. 2d 929, 934 (Tex. Civ. App.), except enforcement may be enjoined for fraud.[24] But the question whether the amount of such an assessment might be collaterally attacked, even for fraud, in a federal mail fraud case is not presented here, for after a most careful examination we are compelled to say that the indictment did not expressly or impliedly charge, and there was no evidence tending to show, that the taxes assessed were excessive, "padded" or in any way illegal. Nor did the court submit any such issue to the jury. Indeed, the court refused a charge proffered by counsel for petitioners

---

[21] *Madeley v. Trustees of Conroe Ind. School Dist.*, 130 S. W. 2d 929, 934 (Tex. Civ. App.).

[22] Vernon's Tex. Rev. Civ. Stat. Art. 2784e.

[23] Vernon's Tex. Rev. Civ. Stat. Arts. 2784e, 2827.

[24] *Madeley v. Trustees, supra*, 130 S. W. 2d, at 932; *Kluckman v. Trustees*, 113 S. W. 2d 301, 303 (Tex. Civ. App.).

that would have submitted that issue to the jury.[25]   Such was not the Government's theory.   In fact, the Government took the position at the trial, and argued to the jury, ·that the taxes assessed and collected were needed by the District for a new "science hall," "office building," "plumbing facilities [and] all sorts of things," and that petitioners' misappropriations not only deprived the District of those needed things but left it "two and one-half years in debt"—a sum several times greater than that said to have been misappropriated by petitioners.

The theory that it was *impliedly* charged and shown that the taxes were illegal in that they were assessed, collected and accumulated in excess of the District's needs in order to provide a fund for misappropriation, was first injected into the case by the Court of Appeals.   That court rested its judgment largely upon its conclusion that the assessments were designed to bring in not only "enough money . . . to provide for the legitimate operation of the schools [but also] enough additional . . . to provide the funds to be looted."   265 F. 2d, at 897.   We think that theory and conclusion is not supported by the record.   As stated, no such fact or theory was charged in the indictment, shown by the evidence or submitted to the jury, and moreover the Government negatived any such possible implication by taking the position at the trial that the assessed taxes were needed for new school facilities and improvements and that the misappropriations deprived the District of those needed things and left it "two and one-half years in debt."

Nor does the Government question that the Board, to collect the District's taxes (largely from nonresident property owners), was required by the state law to use the mails.   Indeed, it took the position at the trial, and argued to the jury, that the Board could not "collect these taxes

---

[25] See note 19.

from Houston, from the Humble, from The Texas Oil Company, and from the taxpayers all over the State of Texas without the use of the United States mails." The Court of Appeals thought that such legal compulsion placed petitioners "on the horns of a dilemma" because they could not at once contend that the law compelled them to cause the mailings and deny that they did cause them. 265 F. 2d, at 898.

The crucial question, respecting Counts 1 through 16 of the indictment, then comes down to whether the legally compelled mailings of the lawful—or, more properly, what are not charged or shown to have been unlawful—letters, tax statements, checks and receipts, complained of in those counts, properly may be said to have been for the purpose of executing a scheme to defraud because those legally compelled to cause and causing those mailings planned to steal an indefinite part of the receipts.

The fact that a scheme may violate state laws does not exclude it from the proscriptions of the federal mail fraud statute, for Congress "may forbid any . . . [mailings] . . . in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not." *Badders* v. *United States,* 240 U. S. 391, 393. In exercise of that power, Congress enacted § 1341 forbidding and making criminal any use of the mails "for the purpose of executing [a] scheme" to defraud or to obtain money by false representations—leaving generally the matter of what conduct may constitute such a scheme for determination under other laws. Its purpose was "to prevent the post office from being used to carry [such schemes] into effect . . . ." *Durland* v. *United States,* 161 U. S. 306, 314. Thus, as its terms and purpose make clear, "[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appro-

priate state law." *Kann* v. *United States,* 323 U. S. 88, 95. Therefore, only if the mailings were "a part of the execution of the fraud," or, as we said in *Pereira* v. *United States,* 347 U. S. 1, 8, were "incident to an essential part of the scheme," do they fall within the ban of the federal mail fraud statute.

The Government, with the support of the cases, soundly argues that immunization from the ban of the statute is not effected by the fact that those causing the mailings were public officials [26] or by the fact that the things they caused to be mailed were "innocent in themselves," if their mailing was "a step in a plot." *Badders* v. *United States, supra,* at 394.[27] It then argues that the jury properly could find that the mailings, complained of in the first 16 counts—namely, the letter notice of a modification in assessed valuation, two letters giving notice of hearings before the Board of Equalization to determine taxable value of property, one letter complying with a property owner's request for an "auxiliary tax notice," and 12 checks of taxpayers and their letters of transmittal [28]— were, even if innocent in themselves, each "a step in a plot" or scheme to defraud, and that they were caused to be made "for the purpose of executing such scheme" in violation of § 1341. But it cites no case holding that the mailing of a thing which the law required to be mailed may be regarded as mailed for the purpose of executing a plot or scheme to defraud. Instead, it frankly concedes

---

[26] *Bradford* v. *United States,* 129 F. 2d 274, 276 (C. A. 5th Cir.); *Shushan* v. *United States,* 117 F. 2d 110, 115 (C. A. 5th Cir.). See also *Steiner* v. *United States,* 134 F. 2d 931, 933 (C. A. 5th Cir.).

[27] *United States* v. *Earnhardt,* 153 F. 2d 472 (C. A. 7th Cir.); *Holmes* v. *United States,* 134 F. 2d 125, 133 (C. A. 8th Cir.); *Mitchell* v. *United States,* 126 F. 2d 550 (C. A. 10th Cir.); *Stephens* v. *United States,* 41 F. 2d 440 (C. A. 9th Cir.). See also *Ahrens* v. *United States,* 265 F. 2d 514 (C. A. 5th Cir.).

[28] See notes 9 and 10.

that there is no such case. It says that "there is no reported case exactly like this," but expresses its view that this case rests on a factually "unique situation."

We agree that the factual situation is unique, and, of course, agree, too, that the fact there is no reported decision involving similar factual circumstances or legal theories is not determinative. But in the light of the particular circumstances of this case, and especially of the facts (1) that the School Board was legally required to assess and collect taxes, (2) that the indictment did not charge nor the proofs show that the taxes assessed and collected were in excess of the District's needs or that they were "padded" or in any way unlawful, (3) that no such issue was submitted to, nor, hence, determined by, the jury, (4) that the Board was compelled to collect and receipt for the taxes by state law, which, in the circumstances here, compelled it to use and *cause* (here, principally by permitting) the use of the mails for those purposes, we must conclude that the legally compelled mailings, complained of in the first 16 counts of the indictment, were not shown to have been unlawful "step[s] in a plot," *Badders* v. *United States, supra,* 240 U. S., at 394, "part[s] of the execution of the fraud," *Kann* v. *United States, supra,* 323 U. S., at 95, "incident to an essential part of the scheme," *Pereira* v. *United States, supra,* 347 U. S., at 8, or to have been made "for the purpose of executing such scheme," within the meaning of § 1341, for we think it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys.

Nor, in the light of the facts in this record, can it be said that the mailings complained of in the first 16 counts of the indictment constituted false pretenses and

misrepresentations to obtain money. Surely the letters giving notice of the modification of an assessed valuation and of valuation hearings to be conducted by the Board of Equalization, constituting the basis of Counts 1, 2 and 5, contained no false pretense or misrepresentation. We fail to see how the letter complying with a property owner's request for an "auxiliary tax notice," constituting the basis of Count 7, could be said to be a misrepresentation. And the mailings complained of in the remaining counts, even though "caused" by petitioners, certainly carried no misrepresentations by petitioners for they were checks (and covering letters) of taxpayers in payment of taxes which, so far as this record shows, were in all respects lawful obligations. On this phase of the case, the Government has principally relied on the fact that the Annual Reports of the Board and the depository bank to the State Commissioner of Education, apparently necessary to obtain the amount per pupil allowed by the State to such districts, contained false entries. But the fact is those mailings were not charged as offenses in the indictment, doubtless because they were, as shown, between Benavides and Austin, Texas, and therefore not within the Division, nor hence the venue, of the court.[29]

Counts 17, 18 and 19 of the indictment relate to a different subject. They charged, and there was evidence tending to show, that petitioners Oscar Carrillo, Sr., and Garza fraudulently obtained gasoline and other filling station products and services for themselves upon the credit card and at the expense of the District knowing, or charged with knowledge, that the oil company would use the mails in billing the District for those things. The mailings complained of in those counts were two invoices, said to contain amounts for items so procured by Carrillo and Garza, mailed by the oil company, at Houston, to

---

[29] Rule 18 of Fed. Rules Crim. Proc., quoted in note 11.

the District, at Benavides, and the District's check mailed to the oil company, at Houston, in payment of the latter invoice. We think these counts are ruled by *Kann* v. *United States, supra.* Here, as in *Kann,* "[t]he scheme in each case had reached fruition" when Carrillo and Garza received the goods and services complained of. "The persons intended to receive the [goods and services] had received [them] irrevocably. It was immaterial to them, or to any consummation of the scheme, how the [oil company] . . . would collect from the [District]. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires." 323 U. S., at 94.

Inasmuch as the twentieth count charged petitioners with conspiring to commit the offense complained of in Count 1, and inasmuch as, on the facts of this record, that count cannot be sustained, it follows that petitioners' convictions upon the twentieth count cannot stand.

In view of our stated conclusions, it is unnecessary to discuss other contentions made by petitioners.

. The strongest element in the Government's case is that petitioners' behavior was shown to have been so bad and brazen, which, coupled with the inability or at least the failure of the state authorities to bring them to justice,[30] doubtless persuaded the Government to undertake this prosecution. But the showing, however convincing, that state crimes of misappropriation, conversion, embezzle-

---

[30] Petitioners Parr, Chapa and Donald were several times tried in the state court on charges growing out of matters involved in this case. Parr and Donald were ultimately found guilty but their convictions were reversed. *Donald* v. *State,* 165 Tex. Cr. R. 252, 306 S. W. 2d 360 (1957); *Parr* v. *State,* 307 S. W. 2d 94 (Tex. Crim. App. 1957). Chapa was tried on two other indictments returned in the state court, both charging fraudulent conversion of the District's funds. He was acquitted on the first indictment and convicted on the second but his conviction was reversed. *Chapa* v. *State,* 164 Tex. Cr. R. 554, 301 S. W. 2d 127 (1957).

ment and theft were committed does not establish the federal crime of using the mails to defraud, and, under our vaunted legal system, no man, however bad his behavior, may be convicted of a crime of which he was not charged, proven and found guilty in accordance with due process.

*Reversed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.

The petitioners, nine individuals and two banks, were indicted for violations of, and conspiracy to violate, the Mail Fraud Act, 18 U. S. C. § 1341. All were convicted on the conspiracy count, and all but two, who were exonerated on all of the substantive counts, were convicted of eight or more of the nineteen specific mailings charged.

Together these petitioners controlled a public body created under Texas law, the Benavides Independent School District (hereinafter called the District), which administered the public schools within its geographical confines, and dominated the bank serving as depository of the District, designated as such pursuant to statute. Vernon's Tex. Rev. Civ. Stat. Arts. 2763, 2763a. Through their control of the District's fiscal affairs they looted it of at least $200,000 between 1949 and 1953.

The District was vested by Texas law with a limited taxing power, Vernon's Tex. Rev. Civ. Stat. Art. 2784e, and the annual collection of taxes was the primary source of revenue for maintaining its public schools. The District, and therefore these petitioners exercising the powers of the District, assessed and collected an ad valorem property tax which was by law to be devoted exclusively to the maintenance of the public schools. They were empowered to fix the rate of taxation according to projected needs, whether for expenditures or reserves. Vernon's Tex. Rev. Civ. Stat. Arts. 2784e, 2827. Apart from their

duty to confine the tax to school purposes, petitioners' discretionary power to fix the rate was unlimited, except that a maximum rate was fixed by statute. Vernon's Tex. Rev. Civ. Stat. Art. 2784e. In 1951, petitioners raised the tax rate to the statutory maximum, and thereafter taxed at that rate. Pursuant to a scheme devised in 1949, they regularly spent less than the amount collected on the schools, created no reserves, and appropriated a portion of the proceeds to their own uses. When their domination of the District ceased in 1954, school expenditures sharply rose, while tax collections remained substantially unchanged.

Conduct or transactions fall under the Mail Fraud Act if it be established that there existed "any scheme or artifice to defraud" and that the mails were used "for the purpose of executing such scheme or artifice or attempting so to do." Of the nineteen substantive violations charged in this indictment, sixteen were mailings in connection with the tax collection process carried out by petitioners. As to those counts this case presents the question whether the Act is violated by a public officer vested by law with a discretionary power to levy taxes for the purpose of providing funds estimated to meet projected expenditures for a statutorily defined public need for the satisfaction of which the power is entrusted to him, who exercises that power over several years to collect through the mails sums which could as a matter of law be so expended, but a portion of which he at all times, throughout successive years of fixing the tax rate and utilizing the proceeds, actually intends to and does appropriate to his own uses.

Petitioners urge that because the amounts they collected each year were credited to the taxpayers on the District's books, and were not in excess of what they might, had they lawfully applied the proceeds, have expended for school maintenance, the collections were in effect lawful and did not constitute a fraudulent scheme

in the collection of the taxes, so that there was no wrong-doing, nothing illicit, till they misapplied the innocently collected funds. Their case is that it must therefore be concluded that the mailings, which occurred in the course of the exercise of the District's lawful taxing power, were not for the purpose of "executing" their scheme within the meaning of the Act, regardless of the fact that it was established beyond peradventure that their abuse of the District's powers was a seamless fraudulent scheme, conceived and executed as such with every element of the enterprise interdependent with every other.

Insofar as the defense rests on the lawfulness of the isolated act of mailing as a claim of immunity from the Mail Fraud statute, it is without substance. It has long been established that under this Act "[i]ntent may make an otherwise innocent act criminal, if it is a step in a plot." *Badders* v. *United States*, 240 U. S. 391, 394. In fact the heart of petitioners' effort to escape their conviction is the claim that the skulduggeries of which the jury found them guilty do not fall within the scope of the Mail Fraud statute because in sending out the tax bills they were the neutral vehicles of legal compulsion, although at the time that they sent them out, and having full governmental control of the process of controlling revenue and expending it, they had predetermined that the proceeds were not to be fully applied to school purposes but were in part to be diverted into their private pockets. It bespeaks an audacious lack of humor to suggest that the law anywhere under any circumstances requires tax collectors who send out tax bills, and who also have complete control over the returns, to send out bills to an amount which they predeterminedly design to put in part to personal uses. That is certainly not the law of Texas in any event. While it may be assumed that, since the maintenance of the schools was the duty of the District, petitioners were obligated to collect some amount of ad valorem tax for

that purpose, it is undisputed that how much was to be expended, and therefore how much was to be collected, was determined not by Texas law but by the discretion, the voluntary act, of petitioners themselves. No Texas statute required them to collect what they intended to spend to keep the schools running, plus an amount which they intended to misappropriate,[1] and that is precisely what the proof established and the jury found that they did.

Petitioners' claim raises the further question whether, even if the mailings were not immune in themselves, they were too remote from the purpose of the fraudulently designed scheme to be deemed in "execution" of it. Whether a mailing which occurs in discernible relation to a scheme to defraud is an execution of it is a question of the degree of proximity of the mailing to the scheme. The statute was enacted "with the purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to carry them into effect . . . ." *Durland* v. *United States,* 161 U. S. 306, 314. Whether the post office was so used must be the Court's central inquiry. If the use of the mails occurred not as a step in but only after the consummation of the scheme, the fraud is the exclusive concern of the States. *Kann* v. *United States,* 323 U. S. 88. The adequate degree of relationship between a mailing which occurs during the life of a scheme and the scheme is of course not a matter susceptible of geometric determination. In *United States* v. *Young,* 232 U. S. 155, we said that it is not neces-

---

[1] See *Madeley* v. *Trustees,* 130 S. W. 2d 929, 932 (Tex. Civ. App.), and *Kluckman* v. *Trustees,* 113 S. W. 2d 301, 303 (Tex. Civ. App.), both stating that an action will lie to enjoin the collection of taxes on the ground of the Trustees' fraud; and *Stephens* v. *Dodds,* 243 S. W. 710 (Tex. Civ. App.), suggesting that a referendum conferring on the Trustees the power to tax may be void if the tax is not for the statutory purpose.

sary that the scheme contemplate the use of the mails as an essential element, and in *Pereira v. United States,* 347 U. S. 1, 8, we found a mailing to be in execution of a scheme because it was "incident to an essential part" of it. The determining question is whether the mailing was designed materially to aid the consummation of the scheme, as, for example, in *Pereira v. United States, supra,* by the obtaining of its proceeds through the innocent collection of defendant's fraudulently obtained check by his bank.

For the purposes of the statute, the significance of the relationship between scheme and mailing depends on the interconnection of the parts in a particular scheme. Ordinarily, once the fraud is proved its scope is not a matter of dispute. But when, as here, the fraud involves the abuse of a position of public trust, closer analysis is required. Petitioners seek to denude their scheme of its range and pervasiveness. They construct an artifact whereby their fraudulent scheme was, as it were, intramural, unrelated to taxpayers to whom they sent the tax bills, and so the mails, the ingenuous argument runs, were not used in the fraud because the wrongdoing only arose after the mails had fulfilled their function by bringing the returns. The wrong is thus nicely pigeonholed as embezzlement, without any prior scheme.

The fraudulent, episodic, petty-cash peculations of a clerk at a regulatory agency are frauds upon that agency, and although taxpayers generally are injured by the fraud and in that sense are the ultimate objects of it, the mailings by which the tax proceeds are collected which constitute the vast government funds out of which the agency's funds are taken, are, as a matter of practical good sense by which law determines such issues of causation, see *Gully v. First National Bank,* 299 U. S. 109, 117–118, too remote from the scheme to be deemed in execution of it. But to analogize petitioners' scheme to a conven-

tional case of peculation by an employee, whether public or private, is to disregard the facts of this case.

The petitioners themselves controlled the entire conduct of the District's fiscal affairs, and their own decision, limited only by a statutory ceiling, determined the amount of the tax that would be collected. Petitioners' exercise of their power to fix the amount of the tax, an exercise which ultimately assured to themselves an excess of funds over their intended expenditures or reserves for school purposes, was necessarily central to their scheme. Such control obliterates the line they seek to draw between themselves and the entity it was their duty to serve. By demanding and collecting what they intended to misappropriate they made the process of collection an inseparable element of their scheme.

The petitioners' control of the District and therefore of its tax rate, similarly disposes of their contentions that one or another element of a technical fraud upon the taxpayers of the District is absent. The suggestion that in the collection of taxes there was no representation by petitioners to the taxpayers of the District might be pertinent were the system a self-executing tax structure under which the time for, and amount of, the payment due and the payee to whom it is to be made are designated by statute, so that the tax collector, serving as an automatic conduit, does nothing to cause collection of the tax. These collectors, however, were the prime actors in the structure. They not only billed the taxpayers but also fixed the rate of the tax itself. For that reason it cannot be said that the taxpayers paid their taxes solely under compulsion of Texas law, and not at all in reliance upon the implied false representation of petitioners that the amounts assessed were collected to meet projected expenditures. The taxpayers necessarily depended upon petitioners' setting of the rate for knowledge of what amount was to be paid. Each taxpayer who testified revealed

that he awaited his bill before making payment. The fact, much relied on by petitioners, that an available Texas procedure for challenging the tax was not invoked, establishes not, as is argued, the legality of the tax, but the reliance of taxpayers on petitioners' implied representations in the collection of it.

The intention of petitioners to have their bills paid is beyond dispute. But they urge an absence of detriment to the taxpayers who did rely since their payments were ordinarily credited to them on the District's books. The claim is frivolous. Whether they are viewed as having overpaid for school services, or having been deprived of services for which they paid, the detriment to the taxpayers is self-evident. It is in part for this reason that petitioners' attempted analogy between this case and the case of a doctor's secretary who sends out just bills but intends to steal from the proceeds is to urge that a mountain is a molehill. Even if the secretary, rather than her principal, is regarded as making the representation to patients that they may pay her, they are not injured by so doing, and they are not defrauded. The result would be very different, as petitioners concede, if the bills so sent out were padded by her. Here inescapably the bills were padded by the predetermined increase, which, though within technical legal limits, was for fraudulent ends.

Although this analysis appropriately disposes of this case it goes beyond the requirements of the statute. While the Mail Fraud Act is directed against the utilization of the mails in carrying out a fraudulent scheme, the penal prohibition of the use of the mails for a fraud does not turn on the niceties of the common-law offense of obtaining money or goods under false pretenses, see *Durland* v. *United States,* 161 U. S. 306, 312–313. The statute sought to forbid the use of the mails as a vehicle for a fraudulent

enterprise in the ordinary sense of a fraud—a dishonest and cheating enterprise. It is significant that the Act was amended in 1909 by adding to the outlawry of a "scheme or artifice to defraud" the expanding condemnation, "obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 35 Stat. 1130. While of course penal criminal statutes must not be extended beyond the fair meaning of English words, they must not be artificially and unreasonably contracted to avoid bringing a new situation within their scope which plainly falls within it in light of "the evil sought to be remedied." *Durland* v. *United States, supra,* at 313. The lay, commonsensical way of interpreting condemnation of aspects of fraud in federal penal legislation is illustrated by the settled doctrine that the prohibition against defrauding the United States in 18 U. S. C. § 371 extends far beyond the common-law conception of fraud in that financial or property loss is not an ingredient of the offense. *Haas* v. *Henkel,* 216 U. S. 462, 480; see also *United States* v. *Plyler,* 222 U. S. 15. If the fraudulent enterprise of which this record reeks is not a scheme essentially to defraud the taxpayers who constitute the District rather than a disembodied, abstract entity called the District, English words have lost their meaning.

Petitioners finally urge as to these counts that their convictions cannot be sustained because, even if the facts were sufficient to sustain a conviction, the indictment did not allege, the proof did not show, the conduct of the trial and the summations to the jury did not reveal, and the charge to the jury did not present, such a case either as to fact or law. It is apparent however that every aspect of this prosecution was focused on the Government's basic assertion that because petitioners controlled the District's affairs, continuously schemed to and did misappropriate funds while continuing to collect falsely

represented revenues from taxpayers by mail, the use of the mails to collect taxes was in execution of a scheme to defraud the District and its taxpayers.

The indictment in every substantive count expressly alleged "a scheme and artifice to defraud the BISD, persons obligated by the laws of the State of Texas to pay taxes to the BISD (hereinafter called taxpayers), the State of Texas, and . . . to obtain the money and property of the BISD and the taxpayers for themselves . . . ." The primary devices allegedly undertaken to effectuate the scheme were the obtaining and maintaining of control of the District and its depository bank, and the collection of taxes by mail from District taxpayers during the period of the scheme.

The Government's proof established a design of petitioners to obtain control of the political and fiscal mechanism of the District, and that, having obtained control and being the *dominus* of the District, they sent out tax bills of the returns from which, year after year, they took a portion for themselves. The proof thus established a continuing course of conduct constituting, by the very nature of the systematic continuity of the practice, a conscious scheme to utilize their powers of government, of which setting the tax rate was one, for fraudulent purposes, in the execution of which the mails of the United States were a necessary instrument. Objections to government evidence offered on the substantive counts as to events before 1951 were overruled on the well-settled ground that the offers were admissible to show the continuing scheme to acquire, maintain and abuse control of the District.

In its summation the Government repeatedly characterized the scheme which it had sought to prove as one to employ petitioners' comprehensive control to max-

imize District revenues with a view to stealing funds,[2] and the charge adequately placed the issues of the indictment and trial before the jury.

· The remaining three substantive counts of the indictment charged that as part of the same scheme to control and defraud the District the petitioners used the District's charge account to obtain gasoline for their personal use, which acts resulted in the use of the mails by the vendor to present the appropriate bills to the District. The mailings of two such bills and of one payment by the District were charged as separate offenses. Two matters are to be noted. First, it is suggested that there was no misrepresentation by the petitioners, because only the correct bill of the vendor was sent to the District. No reason appears however why a bill which the jury could have found petitioners knowingly caused to be sent to the District constitutes less of a representation by them that the gasoline consumed was used for the District's purposes than a voucher directly submitted by them for reimbursement for cash purchases.

---

[2] "A continuing scheme year after year, send out the tax notice, rake in the harvest through the mails, and then milk it by several methods as outlined." "[T]his was a continuing scheme to defraud. This was not a scheme which these defendants thought up 'I will take one check and convert it to my own use,' but it went on, '48, '49, '50, '51, '52, '53, in order to draw out more fraudulent checks, more money from the depository banks they had to replenish the supply." "It is the·Government's theory of this case that these defendants took over a mail-order business. . . . The defendants knew that; they had to know it." "What is the function of the School District? The function of the School District is to provide for the public education, the free education of the students, all the children who live in their district. . . . The trustees are someone in whom confidence . . . trust and reliance are placed by the taxpayers . . . . · What was the school district used for in this instance? . . . it was used as a personal vehicle for the fraudulent designs and purposes of these defendants."

Second, it is urged that, under the rationale of *Kann* v. *United States*, 323 U. S. 88, the mailings, even if caused by petitioners, were not in execution of a scheme to defraud because the scheme was consummated once they received the gasoline. *Kann* v. *United States* found an appropriate instance of such a limitation; but it also expressly excepted from the force of the rule situations in which the subsequent mailing has the function of affording "concealment so that further frauds which are part of the scheme may be perpetrated," *supra,* at 94–95. Here the jury might properly have found that consumption of gasoline for private purposes was but one device of petitioners for turning their control of the District to their personal advantage, and that the continuing presentation and payment of the bills, and not merely the receipt of the gasoline, was the purpose of the scheme.

Petitioners raise no substantial objections to the conspiracy convictions that are not disposed of by what has already been said. The petitioners' other attacks against the verdict require no more discussion than given below. 265 F. 2d 894.

I would affirm the judgments.