REVISED SEPTEMBER 24, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-60908

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

STEVE D CALDWELL

Defendant - Appellant

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

August 13, 2002

Before KING, Chief Judge, and PARKER and CLEMENT, Circuit Judges.

KING, Chief Judge:

After a jury trial, Defendant-Appellant Steve Caldwell was convicted of three counts of mail fraud and one count of money laundering. On appeal he challenges his convictions and sentence on several grounds. Finding no reversible error, we AFFIRM Caldwell's conviction and sentence.

## I. BACKGROUND

1

On November 4, 1998, a grand jury returned an indictment charging Steve Caldwell with six counts of mail fraud in violation of 18 U.S.C. §§ 1341, 1346, and 2 (2000), and two counts of money laundering in violation of 18 U.S.C. §§ 1957 and 2 (2000).  On the government's motion, the district court dismissed two of the mail fraud counts prior to trial.

At Caldwell's trial, the government presented testimonial and documentary evidence regarding his activities from approximately March 1993 to December 1996 in connection with the corporate entities that were created by the Venture Capital Act of 1994, MISS. CODE ANN. §§ 57-77-1, et seq. (1996), amended by MISS. CODE ANN. §§ 57-77-2, et seq. (Supp. 2001).[1]  Caldwell played a large role in bringing the Venture Capital Act into existence. In advocating this legislation, he represented himself to governmental officials as being associated with Capital Strategies Group ("CSG"), a company that he formed and wholly owned.  In March 1993, Caldwell and Lee Gilliand, who was the president and the sole employee of CSG, assisted officials of the Mississippi Department of Economic and Community Development (the "DECD") in developing and drafting legislation creating a publicly-funded entity designed to attract venture capital from

---

[1]  In 1998, after the events underlying Caldwell's convictions occurred, the Mississippi Legislature amended the Venture Capital Act.  See MISS. CODE ANN. § 57-77-2 (Supp. 2001). All subsequent citations to the Venture Capital Act in this opinion are to the original version unless otherwise specified.

2

private investors.  Once the DECD submitted the draft legislation to the Mississippi legislature, Caldwell and Gilliand lobbied to secure its passage, which occurred in January of 1994.

The Venture Capital Act provided for the formation of three entities —— the Magnolia Capital Corporation ("Magnolia Capital"), the Magnolia Venture Capital Corporation ("Magnolia Venture"), and the Magnolia Venture Capital Fund Limited Partnership ("Magnolia Fund") —— "for the purposes of increasing the rate of capital formation; stimulating new growth-oriented business formations; creating new jobs for Mississippi; developing new technology; enhancing tax revenue for the state; and supplementing conventional business financing."  Id. § 57-77-3.  Magnolia Capital, a non-profit corporation, was the sole shareholder of Magnolia Venture, a for-profit corporation that was the general partner of Magnolia Fund.  See id. §§ 57-77-9(1), (3), 57-77-11(1), (3).  The Venture Capital Act further provided for the issuance of state bonds, see id. § 57-77-29, and authorized the DECD to disburse money from the bond proceeds as a loan to Magnolia Capital to be used to give Magnolia Venture funding "for the purpose of providing venture capital to Mississippi businesses," id. § 57-77-17(a)-(b).

Caldwell was among the five members of Magnolia Venture's board of directors, all of whom the director of the DECD appointed pursuant to the Venture Capital Act.  See id. § 57-77-11(2).  At the first board meeting, held on June 6, 1994,

3

Caldwell was elected chairman of the board.  In this capacity, Caldwell called a special meeting of the board approximately one month later for the purpose of presenting for the board's approval (1) an employment contract hiring Caldwell as CEO and (2) a consulting contract with CSG.  Caldwell's employment contract provided for a starting annual salary of $150,000 to be increased by a minimum of 10% each year.  The consulting contract retained CSG to raise capital from the private sector (which was mandated by the Venture Capital Act) and to advise Magnolia Venture regarding investment decisions.  For these and other related services, CSG was to receive an initial payment of $75,000, subsequent payments of $25,000 per month, and a 5% commission on each $5,000,000 in private investment that CSG raised.  The board unanimously approved both contracts.[2]

In justifying the two contracts, Caldwell represented to the board that he and Lee Gilliand were co-owners of CSG.[3]  As noted above, Caldwell was in fact the sole owner of CSG.  In a document entitled "Brief on Specifics of Contract," which Caldwell distributed to the board members at the special meeting, he cited Gilliand's background as a reason for approving the CSG contract. Specifically, Caldwell noted that Gilliand "was Chairman of the

---

[2]  Caldwell abstained from voting on both contracts.

[3]  A booklet containing information about Magnolia Venture, created under Caldwell's direction to be distributed to potential private investors, stated that Caldwell owned 50% of CSG.

4

Governor's Task Force" and "has worked for 18 months without compensation to pass the Venture Capital Legislation." Caldwell's focus on Gilliand in promoting CSG's contract presumably would have made sense to the board members, who, in the words of one board member in her testimony at the trial, "really thought Lee [Gilliand] . . . was the main person [at CSG]."

In the "Brief on Specifics of Contract," Caldwell also stated that the DECD "approved" of his relationship with CSG and that CSG was the only securities dealer in Mississippi licensed to perform the services needed by Magnolia Venture. At trial, however, the DECD official who was primarily responsible for drafting the legislation with Caldwell and Gilliand disavowed any "approval" by the DECD of Caldwell's relationship with CSG. In addition, Mississippi's assistant secretary of state for securities testified that, at the time that the board approved the consulting contract with CSG, 900 firms were registered in Mississippi to perform the services in question. The assistant secretary further testified that CSG was not among these 900 registered firms.

Caldwell was apparently quite certain that his appointment as chairman and the board's approval of the contracts would come to pass even before the Venture Capital Act went into effect in 1994. On December 6, 1993, Caldwell wrote a letter to an investment broker at Merrill Lynch suggesting that it would be

beneficial to Merrill Lynch to finance an existing business loan of Caldwell's because of the income that he expected to obtain as a result of the formation of Magnolia Venture. Specifically, Caldwell wrote:

> Lee and I have worked extensively on the State of Mississippi's new Venture Capital program. . . . [T]he highlights are that the State will put up $20 million. . . . It is planned that I will be Chairman of the Board of the Venture Capital Corporation (a healthy salary included). We will then sign a management contract in the $350,000 range to Capital Strategies to do background and management work for prospective companies. . . . All of this will become public knowledge in January when the legislation is introduced to the . . . Mississippi Legislature.

Caldwell indicated that he would open an account with Merrill Lynch in CSG's name if Merrill Lynch financed his loan.

Shortly after the formation of the Magnolia entities, the DECD loaned Magnolia Capital $20,000,000, the amount generated from the state bonds issued pursuant to the Venture Capital Act. Magnolia Capital then transferred $13,000,000 of the loan amount to Magnolia Venture.[4] As a result of Magnolia Venture's contracts with CSG and with Caldwell, Caldwell obtained significant amounts of Magnolia Venture's funds. Initially, pursuant to its contract with CSG, Magnolia Venture paid CSG $75,000 up front and $25,000 per month thereafter. Additionally, the contract obligated Magnolia Venture to pay for any CSG

---

[4] Magnolia Capital placed the remaining $7,000,000 in zero coupon bonds that would yield the principal amount of the loan in fifteen years.

expenses that were approved by Magnolia Venture's CEO (i.e., Caldwell).  The evidence presented by the government at trial indicated that Caldwell — in his capacity as the owner of CSG — billed Magnolia Venture a total of $14,000 over the course of four months for a non-existent "secretary" and — in his capacity as CEO of Magnolia Venture — authorized the payment of this $14,000 to CSG.

Further, after successfully persuading a private investor, Billy Clements, to invest $5,000,000 in Magnolia Venture, Caldwell claimed CSG's entitlement to a $250,000 commission (5% of the $5,000,000 investment) under its contract with Magnolia Venture.  Originally, Clements agreed to invest only $4,500,000, the amount that the Venture Capital Act required Magnolia Venture to raise before it could invest venture capital in Mississippi businesses.  See MISS. CODE ANN. § 57-77-11(6) (1996).  When Clements expressed his reluctance to increase the amount to $5,000,000 because he needed the difference to pay his taxes, Caldwell promised Clements that he would be permitted to withdraw from the Magnolia Fund the portion of his investment necessary to satisfy his tax obligations.  Clements subsequently withdrew $650,000 from the Magnolia Fund.

In his capacity as CEO of Magnolia Venture, Caldwell approved the issuance of a $250,000 check to CSG for securing the $5,000,000 investment from Clements.  In Magnolia Venture's check register, the payee for this check was recorded as

7

"confidential."  Subsequently, Caldwell's wife (Sandra Caldwell) signed a CSG check in the amount of $225,000 payable to Caldwell, which he deposited in his personal account.  Caldwell later sent a letter to Liza Looser, who was on the board's compensation committee, suggesting that he deserved "a nice bonus" of $75,000 for obtaining the $5,000,000 investment from Clements.  The committee gave him this requested bonus.

Unbeknownst to the other board members, in addition to the $25,000 monthly fee that Magnolia Venture paid CSG for providing, inter alia, advice on investment decisions, CSG secured the agreement of Pat Gilliand, a local securities broker,[5] to give CSG 50% of the commissions that he received from Magnolia Venture for purchasing securities on its behalf.  Gilliand paid CSG a total of $38,730.56 in these "split commissions," which Caldwell subsequently deposited in his personal bank account.

Also without the board's knowledge, Caldwell instructed David Crawford, whom Caldwell had hired as Magnolia Venture's "vice president of investments," to distribute 10% of the general partner's share of profits from Magnolia Venture's investments to Caldwell in his monthly paychecks.  Consequently, over the course of several months in 1996, Caldwell was paid a total of $44,302.50 from Magnolia Venture's profits.  Caldwell's employment contract with Magnolia Venture provided for a

---

[5]  Pat Gilliand is the father of Lee Gilliand, the president of CSG.

distribution of 10% of the general partner's share of profits "upon liquidation of the Fund, or in advance at the discretion of the Board." Two board members testified that the board never approved of such a distribution, and Crawford testified that the Fund was never in liquidation.

The board became concerned about Caldwell's performance as CEO after receiving an audit report and management letter produced by an outside accounting firm. The management letter flagged a number of Caldwell's activities as improper or potentially problematic, including: (1) CSG's failure to provide "detailed billing indicating what work was performed for [Magnolia Venture] each month and the applicable dates of performance," particularly in light of the fact that Caldwell was both CEO of Magnolia Venture and the sole owner of CSG, (2) certain payments made by Magnolia Venture to CSG, including the $14,000 for a "secretary" and $767 in rent each month for office space, (3) CSG's cut of the commissions that Magnolia Venture paid to brokers, (4) Magnolia Venture's payments to American Telesys, a company of which Caldwell owned 72.9%, "for various services," (5) the fact that "no further investors [had been] sought" after Billy Clements invested $5,000,000, even though "other investors had submitted subscription agreements and written investment checks to the [Magnolia] Fund[, which were] returned prior to the closing [of the Magnolia Fund]," and (6) Billy Clements's withdrawal from the Magnolia Fund of $650,000

pursuant to his agreement with Caldwell, thereby reducing the amount of money attributable to private investment "below the $4,500,000 . . . threshold required by the [Venture Capital] Act." According to the management letter, these and other "matters and practices . . . raise concerns about [Magnolia Venture's] long-term financial stability and [about] whether the original spirit of the Venture Capital Act of 1994 . . . is being adhered to in [Magnolia Venture's] operations."

In response to the audit report and management letter, the board appointed Johnny Clements (who became a board member in April 1996 and is the brother of Billy Clements) and another board member to an internal audit committee to investigate Caldwell's activities. Johnny Clements wrote two memoranda reporting on the committee's findings and its conclusion that many of Caldwell's actions constituted breaches of his fiduciary duty to Magnolia Venture. For example, the audit committee determined that Caldwell had acted in the best interest of CSG, rather than of Magnolia Venture, in attributing Billy Clements's investment to Caldwell as owner of CSG, rather than as CEO of Magnolia Venture (in which case Magnolia Venture would not have been obligated to pay the $250,000 commission).

The board members held two meetings at which they discussed the findings in the memoranda with Caldwell. At trial, Johnny Clements testified that at one of these meetings, Caldwell insisted that the $250,000 commission to CSG was proper because

10

Lee Gilliand had been primarily responsible for securing Billy Clements's investment. Shortly after these two meetings, the board terminated Caldwell. Magnolia Venture subsequently declared bankruptcy.[6]

The jury entered specific findings supporting its guilty verdict on three of the four mail fraud counts and on both of the money laundering counts. The district court set aside the jury's verdict on one of the money laundering counts on the ground that the amount of money necessary for conviction could not be

_____

[6] As noted above, the Mississippi Legislature amended the Venture Capital Act in 1998. Section 57-77-2 of the new version explains that because "[t]he Legislature finds that the Venture Capital Act of 1994 . . . has not been implemented in accordance with legislative intent," the Act "needs to be amended for the purpose of clarifying the legislative intent and for the further purpose of ensuring public trust in the venture capital loan program by providing safeguards in the operation of the program and over the proper administration of the use of public funds." MISS. CODE ANN. § 57-77-2 (Supp. 2001). The new clarifications and safeguards include, inter alia:
> (1) that the three Magnolia entities "shall be instrumentalities of the State of Mississippi and their operations and activities shall be subject to review by the State Auditor of Public Accounts, the Attorney General of Mississippi, the Mississippi Ethics Commission, the Joint Legislative Committee on Performance Evaluation and Expenditure Review, and any other state officer or agency as provided by law," id. § 57-77-3,
> (2) that money in or obtained from the Magnolia Fund "and any earnings on such amounts . . . shall remain, and shall be considered to be, public funds," id., and
> (3) that no money in or obtained from the Magnolia Fund "may be used to provide financing for, or to contract for goods or services with, any business in which a director, employee, or limited partner of [any of the Magnolia entities], or the spouse of any such [person] has a direct or indirect interest," id. § 57-77-29(1).

aggregated.  The district court sentenced Caldwell to sixty months' imprisonment on each of the mail fraud counts and to seventy-five months' imprisonment on the money laundering count, all to run concurrently, followed by three years of supervised release.  The court ordered Caldwell to pay the state of Mississippi restitution in the amount of $1,377,830.52 and imposed a special assessment of $250.  Caldwell timely appeals his convictions on all counts and his sentence.

### III. CHALLENGES TO THE CONVICTIONS

Caldwell attacks his convictions primarily on grounds of alleged indictment defects and insufficiency of the evidence.  He also raises a number of challenges to the district court's evidentiary rulings and jury instructions, most of which are more properly framed as challenges to the sufficiency of the evidence. We accordingly address them as such.

As noted above, Caldwell was convicted of three counts of mail fraud in violation of 18 U.S.C. § 1341.  The offense of mail fraud has two basic elements: "(1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." Carter v. United States, 530 U.S. 255, 261 (2000) (quoting Schmuck v. United States, 489 U.S. 705, 721 (1989)). The first element may be satisfied (1) by proof that the

12

defendant devised a scheme or artifice to defraud, which "includes a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, or (2) by proof that the defendant devised a scheme or artifice to engage in one of the two fraudulent acts specified in § 1341, which are "[to] obtain[] money or property by means of false or fraudulent pretenses, representations, or promises," and "to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious . . . article," 18 U.S.C. § 1341.[7]  In the instant case, Caldwell

---

[7]  Section 1341 provides in full:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
18 U.S.C. § 1341 (2000).

13

was charged with, and the jury found him guilty of, devising a "scheme or artifice" both to obtain money and property by means of false and fraudulent representations and to deprive another of the right to honest services.

Caldwell was also convicted of one count of money laundering in violation of 18 U.S.C. § 1957, which prohibits "knowingly engag[ing] in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." Id. § 1957(a). The monetary transaction underlying the charge for which Caldwell was convicted is the deposit in his personal account of the CSG check paying Caldwell $225,000 of the $250,000 commission that Magnolia Venture paid CSG for Billy Clements's $5,000,000 investment. The indictment alleges that the $225,000 was derived from mail fraud in violation of § 1341, which is among the "specified unlawful activities" that can form the basis of a money laundering conviction. See 18 U.S.C. §§ 1957(f)(3), 1956(c)(7)(A), 1961(1)(B) (2000).

## A. Challenges to the Indictment

### 1. The mail fraud charges

Caldwell challenges the mail fraud counts in his indictment on two grounds: (1) the counts are duplicitous, and (2) the indictment insufficiently alleges the elements of the offense. Duplicity of a count and the sufficiency of an indictment are

14

both issues of law that this court reviews de novo.  United

States v. Sharpe, 193 F.3d 852, 865-66 (5th Cir. 1999)

(duplicity); United States v. Alford, 999 F.2d 818, 823 (5th Cir.

1993) (sufficiency of the indictment).

A duplicitous indictment is one that alleges "two or more

distinct and separate offenses" in a single count.  United States

v. Morrow, 177 F.3d 272, 296 (5th Cir. 1999).  Accordingly, in

determining whether an indictment is duplicitous, the inquiry is

"whether [the indictment] can be read to charge only one

violation in each count."  Sharpe, 193 F.3d at 866.

Caldwell's indictment alleges that he "intentionally devised

and carried out a scheme":

> (1) to defraud the taxpayers and officials of the State
> of Mississippi, the Board of Directors for [Magnolia
> Venture], and others to obtain money and property by
> means of false and fraudulent representations, pretenses
> and promises, and (2) [to] depriv[e] [Magnolia Venture]
> of its intangible right of honest services by breaching
> his fiduciary duty owed to [Magnolia Venture] as [its]
> Chairman of the Board of Directors and Chief Executive
> Officers.

After detailing Caldwell's alleged conduct in devising this

scheme, the indictment alleges that Caldwell knowingly mailed

certain letters via the U.S. Postal Service for the purpose of

executing the scheme to obtain money and to deprive of honest

services, "each [letter] constituting a separate count."

Relying on United States v. Curry, 681 F.2d 406 (5th Cir.

1982), Caldwell argues that the mail fraud counts are duplicitous

because each count alleges more than one scheme, i.e., each count

15

alleges both (1) a scheme to defraud Mississippi officials and taxpayers and the board of Magnolia Venture to obtain money by false and fraudulent representations and (2) a scheme to deprive Magnolia Venture of the right to honest services.  We agree with the government that Caldwell's indictment alleges only one scheme with two objects.  However, even if each mail fraud count did allege multiple schemes, it does not follow, as Caldwell argues, that the counts would be duplicitous.  While Caldwell is correct that this court described the indictment at issue in Curry as alleging "two separate and distinct fraudulent schemes," 681 F.2d at 411, we did not hold that each separate scheme constitutes a separate mail fraud offense.  Instead, we explicitly recognized that "[u]nder the mail fraud statute, each mailing is a separate violation."  Id. at 409 n.5 (emphasis added); see also United States v. St. Gelais, 952 F.2d 90, 97 (5th Cir. 1992) ("It is not the scheme to defraud but the use of the mails or wires that constitutes mail or wire fraud.").

In United States v. Harvard, 103 F.3d 412 (5th Cir. 1997), we rejected essentially the same duplicity argument as Caldwell's in reviewing a bank fraud count alleging that the defendant had devised a scheme "to defraud" and "to obtain monies by false representation."  Id. at 420.  We reasoned that these two allegations were "alternative ways in which [the] offense c[ould] be committed," not allegations of multiple violations of § 1344.  Id.; cf. Sanabria v. United States, 437 U.S. 54, 66 n.20 (1978)

16

("A single offense should normally be charged in one count rather than several, even if different means of committing the offense are alleged.") (citing FED. R. CRIM. P. 7(c)(1)).

Accordingly, where a mail fraud count alleges only <u>one</u> instance of use of the mail in furtherance of multiple schemes (or a single scheme with multiple objects), the jury can find the defendant guilty of only <u>one</u> mail fraud offense on that count —— regardless whether the jury finds that the defendant devised one or all of the alleged schemes associated with that particular use of the mail. Each mail fraud count in Caldwell's indictment contains only one allegation of use of the mail. Thus, none of the counts is duplicitous.

Caldwell also mounts several challenges to the sufficiency of the mail fraud charges in his indictment. First, he contends that the indictment insufficiently alleges mail fraud because Magnolia Venture is a private corporation, and private corporations cannot be deprived of the right to "honest services" for purposes of mail fraud. In support of this position, Caldwell relies on <u>McNally v. United States</u>, 483 U.S. 350 (1987), a pre-§ 1346 case in which the Supreme Court held that § 1341 was "limited in scope to the protection of property rights," and thus reversed the defendants' mail fraud convictions based on a scheme to deprive the citizens and government of Kentucky of honest services. <u>Id.</u> at 352, 360-61. The <u>McNally</u> Court reasoned that "[i]f Congress desires to go further, it must speak more clearly

17

than it has." Id. at 360. As this court recognized in United States v. Brumley, 116 F.3d 728 (5th Cir. 1997) (en banc), "Congress accepted the Court's invitation [in McNally]" by enacting § 1346, id. at 732, which makes explicit that "the term 'scheme or artifice to defraud' [in § 1341] includes a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346.

According to Caldwell, because § 1346 does not explicitly indicate that it applies to "private corruption," the McNally Court's requirement that Congress make its intentions unequivocal indicates that § 1346 should not be construed as reaching private corruption. This court has concluded otherwise. In United States v. Gray, 96 F.3d 769 (5th Cir. 1996), a post-§ 1346 decision, we affirmed a conviction of "honest services" mail fraud based on conduct undertaken in the private sphere. Id. at 774-75. Accordingly, Caldwell's contention that § 1346 does not extend to "private corruption" lacks merit.

Caldwell further contends that, even assuming § 1346 applies to cases involving private-employer victims, the indictment is nevertheless deficient because it fails to allege all the essential elements of the "honest services" form of mail fraud. Specifically, Caldwell maintains that under this court's decision in Brumley, a violation of state law is an essential element of "honest services" mail fraud that must be alleged in the indictment. Thus, Caldwell argues, the allegation in his

18

indictment that he deprived Magnolia Venture of the right to honest services by breaching "fiduciary duties" that he owed to Magnolia Venture as chairman of its board and CEO is not sufficient because the indictment does not allege a state-law source of these fiduciary duties.

The essential elements of mail fraud that must be alleged in the indictment are "(1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." Carter, 530 U.S. at 261 (internal quotations and citation omitted); see also, e.g., United States v. Reyes, 239 F.3d 722, 735 (5th Cir. 2001).[8] Caldwell's indictment clearly alleges that he deprived Magnolia Venture of its right to his honest services, one of the types of scheme that satisfies the first element of mail fraud. The government correctly points out that the Brumley court did not hold that the state-law source of the right to honest services must be alleged in the indictment. Rather, this court held that, properly interpreted, "honest services" are services owed to an employer under state law and, thus, that the government must prove that the defendant deprived the employer of such services. See Brumley, 116 F.3d at 734.

_____

[8] Although "[a] specific intent to commit fraud" is also an essential element of mail fraud, this court has held that an indictment "need not specifically charge" this mens rea element. United States v. Gordon, 780 F.2d 1165, 1170 (5th Cir. 1986).

19

Caldwell also claims that the charges based on deprivation of "honest services" are insufficient because the indictment fails to allege that the "breach of the fiduciary duty was 'material'." This court has held that "a violation of the [fiduciary] duty to disclose [can] only result in criminal mail fraud where the information withheld from the employer [i]s material," Gray, 96 F.3d at 774 (quoting United States v. Ballard, 680 F.2d 352, 353 (5th Cir. 1982 Unit B)), and that materiality must be alleged in an indictment charging mail fraud, see United States v. Richards, 204 F.3d 177, 192-93 (5th Cir. 2000). However, "[i]f the facts alleged in the indictment warrant an inference [of] material[ity], the indictment is not fatally insufficient for its failure to allege materiality in haec verba." Id. at 192 (quoting United States v. McGough, 510 F.2d 598, 602 (5th Cir. 1975)) (first alteration in original).

Caldwell's indictment alleged sufficient facts to warrant an inference that the information that he failed to disclose was material. The indictment alleges several instances of Caldwell's failure to disclose information to the board of Magnolia Venture, including the failure to disclose (1) his promise to Billy Clements that he could withdraw part of his $5,000,000 investment in the Magnolia Fund "to satisfy [his] tax liability in 1996," (2) his payment to himself of $225,000 drawn from the Magnolia Fund, (3) his solicitation and receipt of $38,730.96 from Pat Gilliand "for a substantial investment in a number of securities

20

[purchased] through [Gilliand] for and on behalf of [Magnolia Venture]," and (4) his direction to Crawford to pay Caldwell a certain percentage of Magnolia Venture's profits each month. The indictment also alleges that, in urging the board to approve the contract with CSG, Caldwell falsely represented that he shared ownership of CSG with Lee Gilliand, that the DECD "approved" of the relationship between Caldwell and CSG, and that CSG was the only firm licensed to perform the services necessary for Magnolia Venture to carry out its mission. Finally, the indictment alleges that Caldwell falsely represented in CSG's bills to Magnolia Venture that CSG had incurred $14,000 in expenses that it did not in fact incur. This information that the indictment alleges Caldwell failed to disclose or misrepresented —— involving significant sums of money and important business decisions —— clearly warrants an inference of materiality.[9]

---

[9] In connection with his argument that the indictment failed to allege materiality, Caldwell contends that the mail fraud charges are insufficient because they fail to specify whether the government considered Magnolia Venture to be a private or public entity. He does not cite any authority for this proposition, but rather asserts that it was necessary for him to know whether the government considered Magnolia Venture to be a private or public entity because in the case of private entities, the government must prove (and he must also defend against) the allegation that the breach of fiduciary duty is material. However, this court has not limited the materiality requirement to cases of "honest services" mail fraud involving private employers. See Gray, 96 F.3d at 774-75. Consequently, the indictment's failure to specify whether Magnolia Venture is a private or a public entity did not deprive Caldwell of notice of the materiality requirement.

Finally, Caldwell argues that his indictment is insufficient because it did not provide the factual specificity necessary to give him adequate notice of the mail fraud charges against him. Specifically, Caldwell objects to the indictment's failure to "specify which action[s]," including the alleged mailings, "furthered which scheme." Federal Rule of Criminal Procedure 7(c) requires that "[t]he indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c). In applying this rule, this court has noted that "[p]ractical, not technical, considerations govern the validity of an indictment, and the test of the validity of an indictment is 'not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'" United States v. Chaney, 964 F.2d 437, 446 (5th Cir. 1992) (quoting United States v. Webb, 747 F.2d 278, 284 (5th Cir. 1984)). In addition to containing all the elements of the charged offense, a constitutionally sufficient indictment "fairly informs" the defendant of the charge that he or she faces and is precise enough to preclude the risk that the defendant may be prosecuted for the same offense in the future. Alford, 999 F.2d at 823.

As noted above, the first paragraph of the mail fraud counts alleges that Caldwell devised a scheme (1) to defraud Mississippi taxpayers and officials and Magnolia Venture's board by means of

22

false or fraudulent representations to obtain money, and (2) to deprive Magnolia Venture of its right to honest services. This initial paragraph largely tracks the language of §§ 1341 and 1346. The subsequent paragraphs describe specific acts alleged to be "part of the scheme and artifice to defraud." More specifically, these paragraphs set out (1) the misrepresentations (both affirmative and by omission) allegedly made by Caldwell, (2) the monetary transactions (including specific amounts) and agreements that he allegedly effected through the use of his authority as CEO of Magnolia Venture and as sole owner of CSG, and (3) the dates on which these acts allegedly took place.

We are unpersuaded by Caldwell's conclusory assertion that the indictment was rendered constitutionally insufficient by its failure to "match" each alleged act with either the scheme to defraud the Mississippi taxpayers and officials and Magnolia Venture's board by false or fraudulent representations to obtain money or the scheme to deprive Magnolia Venture of its right to honest services. The considerable level of detail used in the indictment to describe the various acts constituting the scheme on which the government based the mail fraud counts provided Caldwell with adequate notice of the facts and circumstances on which the mail fraud charges were based and precluded the risk of prosecution for the same offenses in the future.[10]

---

[10] Caldwell also contends that the indictment's allegation of several "unmatched" acts in the mail fraud counts made it

23

Similarly, because the indictment contains detailed allegations of the acts underlying the charges, Caldwell was adequately apprised of how the government understood the mailings to further the scheme.  Two of the mail fraud counts on which Caldwell was convicted are based on letters to two members of Magnolia Venture's board notifying them of the special board meeting that Caldwell called to present his employment contract and the CSG contract to the board for approval.  The allegations regarding Caldwell's misrepresentations at this special board meeting are sufficient to provide Caldwell with notice of how these mailings furthered the alleged scheme.  The third count of mail fraud is based on Caldwell's letter to Liza Looser urging her to grant him a bonus of $75,000 for his performance as CEO.  The indictment specifically referenced this letter, noting that therein Caldwell touted his success in securing a $5,000,000 investment.  In addition, the indictment detailed Caldwell's dealings with Billy Clements that resulted in this investment.  Thus, Caldwell was also fairly informed of the connection between this third mailing and the alleged scheme.

2.    The money laundering charge

---

"impossible for the jury to apply the acts to the schemes" and thus presented the risk of a non-unanimous jury verdict.  The unanimity issue is not presented in this case because the verdict form required the jury to make separate findings on the two purposes of the alleged scheme and on the individual acts that supported each purpose, and the district court made clear in its instructions to the jury that unanimity was required for any positive finding.

Caldwell contends that the money laundering charge is insufficient because it (1) fails to name the financial institution through which he allegedly laundered the $225,000, and (2) fails to provide adequate factual specificity regarding the mail fraud from which the money was allegedly derived. Both of these arguments allege inadequate factual detail regarding elements of the offense — namely, the "monetary transaction" element and the "specified unlawful activity" element. In assessing whether an indictment contains adequate factual information regarding the elements of a charged offense, this court has explained that although an indictment "must allege that the defendant committed each of the essential elements of the crime charged so as to enable the accused to prepare his defense and to invoke the double jeopardy clause in any subsequent prosecution for the same offense," "[i]t is not necessary for an indictment to go further and to allege in detail the factual proof that will be relied upon to support the charges." United States v. Crippen, 579 F.2d 340, 342 (5th Cir. 1978); see also United States v. Williams, 679 F.2d 504, 508 (5th Cir. 1982) (stating that Federal Rule of Criminal Procedure 7(c) "does not mean that the indictment must set forth facts and evidentiary details necessary to establish each of the elements of the charged offense").

In evaluating whether the "monetary transaction" element of a money laundering offense has been alleged with sufficient

25

factual specificity, it is important to bear in mind that "[t]he core of money laundering, which distinguishes one such offense from another, is the laundering transaction itself." United States v. Smith, 44 F.3d 1259, 1265 (4th Cir. 1995). Caldwell maintains that United States v. Pettigrew, 77 F.3d 1500 (5th Cir. 1996), requires that the financial institution through which money is allegedly laundered be named in the indictment. However, as the government points out, the Pettigrew court did not hold that an indictment must include the name of the financial institution in charging a § 1957 offense, but rather noted in dicta that the district court constructively amended the indictment by naming in the jury instructions a bank other than the two banks named in the indictment. See 77 F.3d at 1513 n.11.

The money laundering count in Caldwell's indictment, which closely tracks § 1957, includes the date of the offense and the amount of money. In these circumstances, the absence of the name of the financial institution does not render the charge constitutionally insufficient. The specification of both the date of the offense and the amount of money is sufficiently precise to (1) provide Caldwell with adequate notice of the "monetary transaction" on which the government based the money laundering charge and (2) preclude the possibility of Caldwell's being charged in the future with money laundering for the same transaction.

Caldwell also argues that the indictment's allegation that the "unlawful activity" was "mail fraud in violation of Section 1341, Title 18, United States Code" was not sufficient to give him adequate notice of the factual basis for this element of a money laundering offense. In support of this argument, he relies on United States v. Knowles, 29 F.3d 947 (5th Cir. 1994). In Knowles, this court reaffirmed the rule that "an allegation made in one count of an indictment may be incorporated by reference in another count of the indictment" only if "expressly done." Id. at 952. According to Caldwell, because the money laundering count does not expressly incorporate any of the mail fraud counts, the factual allegations in those counts may not be considered in assessing the sufficiency of the money laundering count. Without these factual allegations, he argues, the mere reference to the offense of mail fraud in the money laundering count insufficiently alleges the "unlawful activity" element.

Although this court has not yet addressed the precise incorporation issue that Caldwell raises, the Fourth Circuit has assessed the sufficiency of an indictment's allegation of "unlawful activity" in a context quite similar to the instant case. In United States v. Smith, 44 F.3d 1259 (4th Cir. 1995), the defendant challenged the sufficiency of the charge that he "caus[ed] $374,578.00 to be transferred and deposited to the Grimm-Gray Trust account at the Sun Bank, Ft. Lauderdale, Florida, which funds were the proceeds of a wire fraud, in

27

violation of 18 U.S.C. § 1343." Id. at 1264 (emphasis added). Reasoning that "the requirement that the funds be illegally derived is not the distinguishing aspect and therefore does not lie at the core of the offense," the Fourth Circuit concluded that "details about the nature of the unlawful activity underlying the character of the proceeds need not be alleged." Id. at 1265. The Fourth Circuit further explained that "the term 'specified unlawful activity' is a defined term referring to a list of offenses which qualify as unlawful activity for purposes of stating a money laundering offense." Id. Thus, because wire fraud in violation of § 1343 "is included as a 'specified unlawful activity' for purposes of money laundering," the Fourth Circuit held that "[n]othing more need be alleged" than that the laundered money was the proceeds of wire fraud in violation of § 1343. Id.

We agree with the Fourth Circuit's analysis of the "specified unlawful activity" element in Smith. Accordingly, we conclude that the statement in Caldwell's indictment indicating that the $225,000 was derived from mail fraud in violation of § 1341 sufficiently alleges the "unlawful activity" element of money laundering.

## B. Challenges to the Sufficiency of the Evidence

Caldwell contends that there was insufficient evidence to support (1) the "scheme" element for all three mail fraud counts

28

of which he was convicted and (2) the "mailing" element for two of those counts. In reviewing a challenge to the sufficiency of the evidence, we ask whether "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Powers, 168 F.3d 741, 746 (5th Cir. 1999). We consider the evidence in the light most favorable to the jury's verdict. Richards, 204 F.3d at 206. As "[t]he jury is free to choose among reasonable constructions of the evidence," id., this court does not assess the weight of the evidence or the credibility of the witnesses, Powers, 168 F.3d at 746.

### 1. The evidence of a scheme

In Caldwell's case, the government advanced two theories of a "scheme." First, the government alleged that Caldwell created a scheme to defraud Mississippi taxpayers and officials and the board of Magnolia Venture of money by "enrich[ing] himself through financial transactions made possible by unlawful misrepresentations and deceits rather than for the statutory purposes of providing venture capital financing." Second, the government alleged that Caldwell created a scheme to deprive the board of Magnolia Venture "of its intangible right of honest services [by] breaching the fiduciary duty owed to [Magnolia Venture] as the corporation's Chairman of the Board and Chief Executive Officer." On the verdict form provided by the district

29

court, the jury indicated its finding that the government had proven both of these theories beyond a reasonable doubt.  As to each theory, the jury further specified the manners in which it found that Caldwell knowingly created the scheme.

The jury found that Caldwell created a scheme against Mississippi taxpayers and officials and Magnolia Venture's board to obtain money by false or fraudulent representations in the following ways:

> (1) "by unlawful representations concealing from the [board] an agreement in a limited partnership with an investor, Billy Clements, where [CSG], owned by [Caldwell], received a commission of $250,000.00,"
>
> (2) "by lying to the President of [CSG] that a $225,000.00 check made payable to [Caldwell] had been spent for the expenses of [CSG],"
>
> (3) "by soliciting and receiving without knowledge of the [board] a total of $38,730.56 from a local securities broker,"
>
> (4) "by paying to himself a total of $44,302.50 representing 10% of the profits of the General Partner's distribution from [Magnolia Venture]," and
>
> (5) "by authorizing payment out of [Magnolia Venture] funds a total of $14,000.00 to be paid to [CSG] for a secretary never hired."

Caldwell contends that neither the conduct specifically found by the jury nor any of the other conduct supported by the evidence establishes a scheme to obtain money by means of false or fraudulent representations.  At most, Caldwell contends, this conduct is evidence of ethical improprieties or "other offenses."

30

As this court has recognized, for purposes of the federal fraud statutes, "[t]he term 'scheme to defraud' is not readily defined, but it includes any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money." United States v. Saks, 964 F.2d 1514, 1518 (5th Cir. 1992) (internal citation omitted). Additionally, the false or fraudulent representations must be material. Neder v. United States, 527 U.S. 1, 25 (1999). In the instant case, the government presented sufficient evidence for a reasonable juror to have found beyond a reasonable doubt that Caldwell knowingly created such a "scheme to defraud."

Based on evidence such as board members' testimony and the "Brief on Specifics of Contracts" (distributed by Caldwell at the special board meeting), the jury was entitled to infer that Caldwell (through CSG) obtained the $250,000 commission on Clements's investment, the $38,730.56 in split commissions from Pat Gilliand, and the $14,000 for the non-existent secretary, by means of the false, material representations that he made to the board in urging it to approve CSG's contract. Specifically, Caldwell falsely represented that he owned only 50% of CSG, that the DECD "approved" of his relationship with CSG, and that CSG

31

was the only firm in Mississippi licensed to perform the necessary investment work for Magnolia Venture.[11]

Further, Caldwell's receipt of the $14,000 directly resulted from his unquestionably false and material representation that CSG had expended that amount to employ a secretary. Caldwell argues that he was unaware that the "secretary" for which he billed Magnolia Venture did not exist. However, there is ample evidence supporting the jury's contrary finding. In particular, a rational juror could have concluded that Caldwell knew that CSG never employed a secretary based on the evidence that Caldwell worked in CSG's office on a regular basis during the four-month period over which he billed Magnolia Venture for secretarial services and that CSG had only one employee (thus the absence of a secretary was likely apparent).

---

[11] Conceding that the representation that he owned 50% of CSG was false, Caldwell maintains that this representation nevertheless may not be deemed part of a mail fraud "scheme" because the representation is not material. According to Caldwell, it is the fact of his ownership interest in CSG that is material — not the extent of that interest. We disagree. A rational juror could have concluded otherwise, particularly in light of the evidence indicating that Caldwell also falsely represented that Lee Gilliand, who was not a member of Magnolia Venture's board, was the co-owner of CSG (in which case Caldwell's purported 50% interest would not have been a majority interest) and was the principal decisionmaker for the company. Moreover, Caldwell made other false and material representations to the board that by themselves support the jury's finding that he devised a scheme to obtain money by false or fraudulent representations.

32

Similarly, although Caldwell points out that CSG's contract with Magnolia Venture entitled CSG to a 5% commission on every $5,000,000 investment, a reasonable juror could have assigned this provision little weight in considering CSG's receipt of the $250,000 commission on the Billy Clements investment in light of the evidence presented at trial indicating: (1) that Caldwell did not inform the board that he agreed to permit Clements to withdraw part of his investment after CSG received the commission, thereby causing the investment to drop below the $5,000,000 threshold required under the contract for CSG to receive a commission, (2) that Caldwell solicited a $75,000 bonus as Magnolia Venture's CEO, in part because he successfully secured the $5,000,000 investment, (3) that Caldwell insisted that Lee Gilliand was responsible for the investment when the board questioned Caldwell about the commission, (4) that Caldwell entered "confidential" as the payee of the $250,000 check issued to CSG in Magnolia Venture's check register, and (5) that Caldwell told Lee Gilliand that the $225,000 of the commission (which Caldwell deposited in his personal account) had been spent on CSG's expenses.[12]

---

[12] Regarding his receipt of the $44,302.50, Caldwell points out that he directed Crawford to include 10% of the general partner's share of Magnolia Venture's profits in Caldwell's paycheck each month and, thus, that this profit distribution was documented information available to the board. However, access to, or even actual knowledge of, the information at issue does not preclude a finding of a scheme to defraud by false or fraudulent representations. It is well-established that

33

We thus conclude that the government presented sufficient evidence for a rational juror to find beyond a reasonable doubt that Caldwell devised a scheme to obtain money by false, material representations. Accordingly, it is unnecessary for us to address the sufficiency of the evidence for the government's alternate theory that Caldwell's scheme also aimed to deprive of the right to honest services. See Powers, 168 F.3d at 753-54.[13]

---

"reliance is not an element of mail fraud." Akin v. Q-L Investments, Inc., 959 F.2d 521, 533 (5th Cir. 1992); see also Neder, 527 U.S. at 24-25 ("The common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes."). Moreover, in the instant case, the two board members on the compensation committee testified that they were not aware of Caldwell's receipt of a percentage of profits on the Fund's money.

Caldwell further contends that he believed in good faith that he was entitled to a percentage of Magnolia Venture's profits under his employment contract. There was sufficient evidence for a rational juror to conclude otherwise. Liza Looser, who was present at the meeting during which the board confronted Caldwell about the internal audit committee's findings, testified that when questioned regarding his taking of a percentage of the profits each month, Caldwell did not explain why he believed he had been authorized to do so, but rather responded that "[i]t was a stupid move" and that he "shouldn't have done it." Additionally, the testimony of several of the government's witnesses indicated that it was readily apparent that Caldwell was not entitled to any profits under his contract or otherwise.

[13] For this reason, we also need not address Caldwell's further argument that there was insufficient evidence to support the "deprivation of honest services" theory of a scheme to defraud because "the government failed to show any tangible harm, economic or otherwise." In any event, this court has made clear in cases involving the "deprivation of honest services" theory that "[a]lthough the Government must prove that some actual harm was contemplated by the defendant, it is well-established that a scheme which operates to deprive citizens of 'intangible rights or interests' is a scheme to defraud under section 1341." Curry, 681 F.2d at 410-11 (emphasis added) (internal citation omitted);

34

## 2. The mailings underlying two of the mail fraud counts

Caldwell challenges the two mail fraud counts based on his letters notifying board members about the special board meeting that Caldwell called for the purpose of submitting his employment contract and the CSG consulting contract for the board's approval. Relying on Parr v. United States, 363 U.S. 370 (1960), and Curry, Caldwell contends that his convictions on the two counts must be reversed because these two mailings were required by Magnolia Venture's bylaws and were not shown to be false. In Parr, the Supreme Court held that members of a school board could not be held liable for mail fraud based on mailings that were required under state law unless the mailings were false or fraudulent. See 363 U.S. at 391-92. Applying the Parr holding in Curry, this court held that the defendant could not be convicted of mail fraud based on affidavits that he mailed pursuant to Louisiana's statute governing campaign-finance disclosure unless the government proved that the affidavits were false and that the defendant either intended to defraud the state agency to which they were mailed or mailed them "in a deliberate

---

see also Brumley, 116 F.3d at 735 (upholding the defendant's conviction for "deprivation of honest services" mail fraud where the government had stipulated that it would not try to prove that the defendant had caused others a monetary loss, but rather had taken the position that "the quid pro quo was intangible, such as favoritism or other types of intangible matters") (alterations omitted).

35

attempt to prevent discovery of his scheme to defraud." 681 F.2d at 412.

Pointing out that Parr and Curry both involved mailings required under state law, the government argues that extending Parr to "all matters which are required by the bylaws of a corporation" would create an "exception that would swallow up most of the mail fraud statute's reach," because "[v]irtually all economic activity can be traced back to a bylaw requirement of some business." We agree that permitting the applicability of the mail fraud statute to depend on corporate-created rules is neither required under Parr nor desirable. Furthermore, even assuming the mailings notifying the board members of the special meeting were required under law as contemplated by the Parr Court, the Parr exception is nevertheless inapplicable because these mailings would not have been made but for Caldwell's alleged scheme to defraud. In Schmuck v. United States, 489 U.S. 705 (1989), the Supreme Court recognized this limitation on the Parr rule:

> Whereas the mailings of the tax documents in Parr were the direct product of the school district's state constitutional duty to levy taxes and would have been made regardless of the defendants' fraudulent scheme, the mailings in the present case, though in compliance with Wisconsin's car-registration procedure, were derivative of Schmuck's scheme to sell "doctored" cars and would not have occurred but for that scheme.

36

Schmuck, 489 U.S. at 713 n.7 (internal citation omitted); see also United States v. Krenning, 93 F.3d 1257, 1264 (5th Cir. 1996) (finding that the "innocent mailings" exception of Parr did not apply because "[e]ven assuming there existed a statute requiring Sovereign Insurance to mail the policies and related documents to the insureds[,] . . . [t]he continuing need to mail policies out to new customers was . . . entirely derivative of the Defendants' decision to fraudulently operate an insolvent insurance company"); United States v. Bright, 588 F.2d 504, 509–10 (5th Cir. 1979) ("Under state law, the mailings in Parr would have occurred irrespective of the defendants' embezzlement . . . Here, by contrast, . . . [i]f [the defendants] had not decided to defraud the estate of their late cousin, they would not have had to comply with the state law requiring them to file the creditors' notice.").

Caldwell called the special meeting that was the subject of the two challenged mailings for the specific purpose of securing the board's approval of his employment contract and of CSG's consulting contract, both of which were essential to the success of Caldwell's alleged scheme. Unlike the situation in Parr, Caldwell's mailings notifying the board members of the special meeting would not have been necessary absent the fraudulent

37

scheme and, accordingly, are proper bases of the mail fraud counts.[14]

Caldwell also attacks his convictions with several claims of error in the district court's evidentiary rulings and jury charge. Many of these claims are essentially reassertions of his challenges to the sufficiency of the evidence supporting the "scheme" element of mail fraud (or are more appropriately framed as such) and thus have been addressed above. As to Caldwell's other challenges to the district court's evidentiary rulings and jury charge, we find no reversible error.

### III. SENTENCING CHALLENGES

Caldwell raises three challenges to his sentence on appeal. Specifically, he contends that the district court (1) improperly calculated the "loss" attributable to him for purposes of determining his sentence for mail fraud under the Sentencing Guidelines, (2) erroneously determined that the state of Mississippi was entitled to restitution as a victim of Caldwell's scheme, and (3) improperly formulated the restitution payment schedule.

---

[14] As Caldwell's claim that there is insufficient evidence supporting his money laundering conviction is derivative of his claim that there is insufficient evidence supporting his mail fraud convictions (mail fraud being the "unlawful activity" alleged in the money laundering count), we also reject Caldwell's sufficiency-of-the-evidence challenge to his money laundering conviction.

**A.   *Calculation of "Loss" under the Sentencing Guidelines***

Caldwell was sentenced under the 1998 edition of the Sentencing Guidelines.  In that edition, the guideline applicable to mail fraud convictions increases the base offense level from zero to eighteen levels depending on the amount of "loss" that the sentencing court attributes to the defendant.  See U.S. SENTENCING GUIDELINES MANUAL § 2F1.1(b)(1), app. A (1998).  Caldwell argues that the district court's calculation of loss is erroneous for two reasons: (1) the court based its calculation on Caldwell's gain without making a threshold determination that there was an actual loss, and (2) the calculation does not account for the services rendered by Caldwell.  In support of these arguments, Caldwell relies on revisions of the definition of "loss" in the guideline's commentary made in Amendment 617, which became effective on November 1, 2001 (after Caldwell was sentenced).  See U.S. SENTENCING GUIDELINES MANUAL app. C, supp. at 185 (1998-2001).  Specifically, Caldwell points to the new provisions in the commentary (1) that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined," U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.2(B), and (2) that "[l]oss shall be reduced by . . . the services rendered, by the defendant or other persons acting jointly with

the defendant, to the victim before the offense was detected," id. § 2B1.1 cmt. n.2(E)(i).

A district court's calculation of loss attributable to a defendant's scheme to defraud is a factual finding that this court reviews for clear error. <u>United States v. Sidhu</u>, 130 F.3d 644, 654 (5th Cir. 1997). Particular provisions of Amendment 617 apply retroactively to Caldwell's case only if they are intended merely to "clarify," rather than to substantively change, the guidelines or their commentary. <u>United States v. Davidson</u>, 283 F.3d 681, 684 (5th Cir. 2002). We need not make this retroactivity determination, however, because the district court's loss calculation is consistent with Amendment 617.

The district court calculated the loss attributable to Caldwell ($1,377,830.52) by adding the amounts paid by Magnolia Venture (1) to CSG ($1,170,779.39), (2) to Caldwell for one of his annual bonuses ($75,000), (3) to American Telesys ($75,483.89),[15] (4) to Caldwell in monthly distributions from Magnolia Venture's profits ($44,302.50), and (5) to a country club for Caldwell's membership fees and purchases ($12,264.74). Initially, Caldwell's argument that this calculation was based on gain is incorrect. The district court's comments at the

---

[15] In arriving at this figure, the district court accounted for the fact that Caldwell owned 72.9% of American Telesys: $75,485.89 is 72.9% of the total amount paid by Magnolia Venture to American Telesys.

sentencing hearing, as well as the amounts themselves, make clear that the district court sought to determine the total amount that Magnolia Venture actually lost as a result of Caldwell's scheme by focusing on the amounts that Magnolia Venture paid to Caldwell and his companies.  Because the court calculated loss in this manner, Caldwell did in fact gain a substantial portion of the total "loss."  However, the court adopted this approach (from Caldwell's presentence report) in order to determine the portion of the total loss incurred by Magnolia Venture that could fairly be attributed to Caldwell, not in order to account for Caldwell's gain.[16]

We also reject Caldwell's contention that the district court's loss calculation does not account for services rendered. As the government points out, by excluding certain amounts that the presentence report counted as losses — including Caldwell's salary, health and life insurance, and travel and entertainment expenses — the district court sufficiently accounted for any services that Caldwell provided to the victims of his fraudulent scheme.  Moreover, even assuming that the district court had not accounted for services rendered, the commentary to Amendment 617 indicates that the provision regarding deduction of value for services rendered is a substantive change rather than a

---

[16]  Thus, the district court did not, for example, attempt to determine how much Caldwell actually gained of the total amounts paid to CSG and American Telesys.

clarification and, thus, may not be retroactively applied to Caldwell's sentence.[17]  Accordingly, the district court did not clearly err in determining the loss attributable to Caldwell for sentencing purposes.

**B.   *Restitution: Proper "Victim" and Payment Schedule***

The district court ordered Caldwell to "pay restitution in the amount of $1,377,830.52" to the treasurer of Mississippi "during incarceration, with any remaining balance to be paid in thirty-two equal monthly installments during supervised release, beginning the first full month of supervision."  Caldwell challenges the district court's restitution order on two grounds: (1) there was no evidence that the state of Mississippi is a "victim" entitled to restitution under the applicable law, and

---

[17]   In particular, the commentary states that this provision "codifies the 'net loss' approach that has developed in the case law, with some modifications," and that "[t]his crediting approach is adopted because the seriousness of the offense and the culpability of a defendant is better determined by using a net approach."  U.S. SENTENCING GUIDELINES MANUAL app. C, supp. at 188 (1998-2001) (emphasis added).  We have found that such language indicates an intention to effect a substantive change with the amendment.  Cf. Davidson, 283 F.3d at 684 (concluding that the "substantive nature of this amendment provision is evident" in light of commentary stating that the Sentencing Commission had "adopted" an approach from caselaw); United States v. McIntosh, 280 F.3d 479, 485 (5th Cir. 2002) (concluding that "the substantive intent is reflected in th[e] commentary, which states in part [that] '[t]he amendment responds in several ways to concerns that the penalty structure existing prior to this amendment for such offenses did not reflect adequately the culpability of the defendant or the seriousness of the money laundering conduct'") (quoting U.S. SENTENCING GUIDELINES MANUAL app. C, supp. at 233-34 (1998-2001)).

42

(2) the financial information that Caldwell submitted to the court indicates that he does not have the ability to make the payments as required by the schedule imposed by the district court.

"Once we have determined that an award of restitution is permitted by the appropriate law, we review the propriety of a particular award for an abuse of discretion." United States v. Hughey, 147 F.3d 423, 436 (5th Cir. 1998). In the instant case, the district court imposed restitution under the Victim and Witness Protection Act, 18 U.S.C. § 3663 et seq. (2000) (the "VWPA"), which provides for mandatory restitution to victims of certain offenses, including mail fraud. Id. § 3663A(a)(1), (c)(1)(A)(ii). As Caldwell's claim that Mississippi is not a "victim" under the VWPA challenges the legality of the district court's restitution order, we address this claim first, and our review is de novo. See United States v. Mancillas, 172 F.3d 341, 342 (5th Cir. 1999).

The VWPA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme . . ., any person directly harmed by the defendant's criminal conduct in the course of the scheme." 18 U.S.C. § 3663A(a)(2). Thus, the VWPA's definition of "victim" serves to "restrict[] the award of

43

restitution to the limits of the offense." Mancillas, 172 F.3d at 343 (internal quotations and citation omitted). In Caldwell's case, there is ample evidence in the record supporting the district court's determination that Mississippi was directly and proximately harmed by the commission of Caldwell's offenses.

Caldwell's contention that Mississippi is not a victim of his offenses appears to be based on the assumption that his actions as CEO and chairman of the board of Magnolia Venture could have directly and proximately harmed only Magnolia Venture, which according to Caldwell is a private, and not a state, entity. We find this notion implausible. It is undisputed that Magnolia Venture was created by state statute and funded by state bonds. The bond director for the Mississippi State Treasury testified at Caldwell's trial that the interest on the "Magnolia Venture" bonds is paid out of the state treasury's general fund, which consists of tax revenues. Similarly, the district court noted at Caldwell's sentencing that the state treasurer had sent letters to the court "express[ing] his outrage on behalf of the [state]" and informing the court that when the bonds mature, "the state will have paid over $14,000,000 in interest."[18]

Furthermore, Magnolia Venture was created, and the money from the bond issue provided to Magnolia Venture, for the

---

[18] The bond director testified that the total amount of interest that the state is obligated to pay over the fifteen-year life of the Magnolia Venture bonds is $14,346,667.50.

44

statutory purposes of, <u>inter alia</u>, "creating new jobs for Mississippi" and "enhancing tax revenue for the state."  MISS. CODE ANN. § 57-77-3 (1996).  As we concluded above, the jury's finding that Caldwell schemed against Mississippi officials and taxpayers to obtain money is sufficiently supported by evidence indicating that Caldwell fraudulently diverted Magnolia Venture's money to himself and his companies instead of expending it in accordance with these statutory purposes.  Accordingly, we find it clear that the district court's designation of Mississippi as a victim of Caldwell's offenses is proper under the VWPA.

Caldwell also challenges the district court's restitution order on the ground that the payment schedule is improper. Pointing out that his adjusted gross income was $43,692 in 1997 and $72,072 in 1998, Caldwell argues that he does not have the ability to comply with the payment schedule.  We review the propriety of the district court's restitution payment schedule for abuse of discretion.  See <u>Hughey</u>, 147 F.3d at 436.  The VWPA instructs sentencing courts to "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A).  The court must take the defendant's financial situation into account, however, in determining "the manner in which, and the schedule according to which, the restitution is to be paid."  <u>Id.</u> § 3664(f)(2).  The

45

VWPA sets forth the following mandatory factors to be considered in determining a restitution payment schedule:

> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
>
> (B) projected earnings and other income of the defendant; and
>
> (C) any financial obligations of the defendant; including obligations to dependents.

18 U.S.C. § 3664(f)(2).

We will reverse a district court's restitution payment schedule "only if the defendant demonstrates that it is probable that the district court failed to consider one of the mandatory factors and the failure to consider that factor influenced the court." United States v. Schinnell, 80 F.3d 1064, 1070 (5th Cir. 1996). We find that Caldwell has not met this burden. The district court relied on the financial information in Caldwell's presentence report, including that "the majority of the defendant's assets are jointly owned with his wife," that he "has been the sole financial provider [for his wife and two children] in recent years," and that "[d]espite considerable income from 1994 through 1996, the defendant and his wife appear to have accumulated a fairly substantial amount of personal debt and have little equity in their home." The payment schedule, although stringent, does not indicate a probability that the district court failed to consider these aspects of Caldwell's financial

46

situation.  The schedule does not require any specific amounts to be paid while Caldwell is incarcerated, but only that "the balance" be paid in thirty-two equal monthly installments after he is released.  Further, the district court specified that interest would not accrue on Caldwell's restitution obligation.

According to the presentence report, after Magnolia Venture's board terminated him, Caldwell obtained employment at a computer resale company where he earned a salary of $97,000 in 1997.  It is thus reasonable to assume that he will have a significant earning potential after his release from prison.  While meeting the payment schedule may require considerable frugality on Caldwell's part, the schedule is not an abuse of the district court's discretion in light of Caldwell's financial circumstances.  Further, as the government points out, if Caldwell finds himself unable to make payments under the schedule at some point in the future, the district court may adjust the schedule "as the interests of justice require."  18 U.S.C. § 3664(k).  We thus affirm the district court's restitution order.[19]

---

[19]  Caldwell also makes a conclusory claim that this court should review "statements of witnesses in F.B.I. 302s" for exculpatory material because the district court overruled his request for production of these statements after reviewing the documents in camera.  Because Caldwell fails to provide any supporting analysis for this claim, we consider it abandoned as inadequately briefed.  See, e.g., Edmond v. Collins, 8 F.3d 290, 292 n.5 (5th Cir. 1993) ("On appeal, we do not review issues not briefed.").

47

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM Caldwell's convictions for mail fraud and money laundering and his sentence.